## JESSIE A. KEYES

*v.*

## MAUD F. KIMMEL *et al.*

*Opinion filed June 21, 1900.*

1. APPEALS AND ERRORS—*error not insisted upon in argument is waived.* One assigning error must bring to the attention of the court what the error is of which he complains, and if but a portion of the errors assigned is insisted upon in the argument the others will be deemed waived.

2. SAME—*verdict in will contest has same force as verdict in suit at law.* The verdict in a will contest has the same force as a verdict in a suit at law, and will not be disturbed, on appeal, unless clearly against the weight of the evidence.

3. WILLS—*that will is procured by party largely interested is a suspicious circumstance.* That a will is procured to be written by a person largely interested in it is a circumstance to excite a stricter scrutiny, and requires stricter proof of volition and capacity on the part of the testator than in case of a will not so procured.

4. SAME—*when judgment in will contest will stand on appeal.* The judgment of the trial court in a will contest will stand on appeal where there is an irreconcilable conflict in the testimony, and the evidence of the successful party, if considered by itself, is clearly sufficient to sustain such judgment.

APPEAL from the Circuit Court of Peoria county; the Hon. T. M. SHAW, Judge, presiding.

This was a bill in chancery filed April 28, 1899, by Maud F. Kimmel and Nellie H. Kimmel, in the circuit court of Peoria county, Illinois, against Jessie A. Keyes, Charles A. Kimmel, Charles E. Kimmel, (a minor,) and Charles A. Kimmel as guardian of Charles E. Kimmel, defendants, contesting and seeking to set aside a will executed by Martha A. Kimmel, deceased, dated July 16, 1895, and a codicil thereto, dated February 26, 1898. The will and codicil were admitted to probate by the probate court of Peoria county March 28, 1898, and letters testamentary were granted to Jessie A. Keyes.

The bill alleges the execution of the writing July 16, 1895, by Martha A. Keyes, purporting to be her last will

and testament, and of, the codicil as part thereof February 26, 1898, and that she died at Peoria February 30, 1898; that at the time of her death she owned real estate in Peoria county, and left surviving her no husband, but two children, defendants Jessie A. Keyes and Charles A. Kimmel, and three grandchildren, Maud F. Kimmel and Nellie H. Kimmel, complainants, and Charles E. Kimmel, defendant, the only heirs of Johnson F. Kimmel, her deceased son, who died intestate, and that no other parties are interested in the suit; that Charles A. Kimmel is married and the other heirs and legal representatives are unmarried; that Charles E. Kimmel is a minor and Charles A. Kimmel is his guardian. The bill sets up the will, which, in effect, divides the property among Charles A. Kimmel, a son by a first marriage, Jessie A. Keyes, a daughter by a second marriage, and Charles E. Kimmel, a grandson, who receives a small portion, while the two granddaughters receive the sum of one dollar each. Provision is made that should Charles E. Kimmel not attain his majority, all money or estate testatrix had bequeathed him should go as follows: $200 to each of four persons named therein, and $200 to the Home of the Friendless of North Peoria. The codicil is as follows: "I now will and bequeath the part I in said will bequeathed to Charles E. Kimmel to be divided as follows: The lot on Knoxville avenue to belong solely to Charles E. Kimmel; the remainder of the share in said will bequeathed to Charles E. Kimmel to be divided equally between Charles E. Kimmel and his two sisters, Maud F. Kimmel and Nellie H. Kimmel."

The bill further alleges that the testatrix, Martha A. Keyes, after the date of said original will and before the date of the codicil thereto, to-wit, on November 18, 1897, duly executed, and caused to be properly attested as her last will, another will revoking said original will; that said will so probated was taken possession of by said Jessie A. Keyes, and that she concealed the same from

the said Martha A. Keyes and prevented her from destroying it, as she desired to do; that said Martha A. Keyes intended and designed to have said will of November 18, 1897, operate as and for her last will; that thereby she devised her estate as follows:    One-third part to said Jessie A. Keyes, one-third part to said Charles A. Kimmel, and one-third part, share and share alike, to the said heirs of Johnson Kimmel, deceased, to-wit, a ninth part to each of these complainants and one-ninth part to said Charles E. Kimmel; that said Jessie A. Keyes, knowing of the execution by her mother, Martha A. Keyes, of the will last above mentioned, and intending to defraud complainants and others out of the devises and bequests in said last mentioned will, which were of the value of $80,000, and secure to herself more than one-half in value of said estate, and to deprive the complainants and said Charles E. Kimmel of all but one-twentieth part of said estate, used, exercised and resorted to falsehood and misrepresentation to induce said Martha A. Keyes to attach a codicil to said original will, dated February 26, 1898; that said Martha A. Keyes was at said last named date (the date of the making of the codicil, February 26, 1898,) in her dotage, and was a paralytic and in a dying condition, and her mind and memory were so impaired that she was wholly incapable, by reason thereof, to make any just distribution of her estate; that at the same time she was under improper restraint and undue influence of the said Jessie A. Keyes and others, and was influenced by the fraudulent arts, practices and coercions of said Jessie A. Keyes and others; that said Jessie A. Keyes, by unkind conduct and harsh language to the said Martha A. Keyes, who was then under the care of said Jessie A. Keyes, and was an aged and confirmed invalid, weak in body and mind and wholly helpless, induced the execution of said codicil without affording said Martha A. Keyes an opportunity to know or understand its effect or purport on the original will or to see or read said will, whereby the

said will so probated was not the will of the said Martha
A. Keyes, but of her, the said Jessie A. Keyes; alleges
Charles E. Kimmel is a minor of the age of sixteen years;
that Charles A. Kimmel is his guardian; prays for the
appointment of a guardian *ad litem* and that said last will
and testament may be set aside.

Charles A. Kimmel answered said bill, admitting the
death of Johnson F. Kimmel, son of Martha A. Keyes,
in June, 1892, intestate, leaving Maud F., Nellie H. and
Charles E. Kimmel his only heirs-at-law; admits the heir-
ship; admits that Martha A. Keyes executed her last will
on the 18th day of November, 1897, and charges that for
fear said Jessie A. Keyes would get possession of and de-
stroy it, she deposited it with one William A. Herron,
of the Peoria Savings Bank, and at the time of leaving
said will cautioned him not to tell said Jessie A. Keyes
thereof, as she would make her, said Martha A. Keyes,
trouble for so doing without having first obtained the
consent of said Jessie A. Keyes and submitting the pro-
visions thereof to her for approval; admits the marriage
of Martha A. Kimmel with Andrew Keyes in 1858; that
he lost his property afterwards and became a charge
upon Martha A. Keyes; that Martha A. Keyes, with the
advice of her sons, Johnson F. and Charles A., bought
the premises in controversy for $3500; that the same be-
came valuable and are now worth $40,000; that with the
exception of a few hundred dollars the earnings of John-
son F. Kimmel, assisted by defendant Charles A., paid
for said premises and supported the family, consisting of
their mother and Jessie A. Keyes, until the latter became
of age, twenty-two years ago; avers that said will and
codicil were obtained by compulsion and undue influence,
and should be set aside.

Jessie A. Keyes filed a separate answer admitting the
death of Martha A. Keyes, and averring the will of Mar-
tha A. Keyes, dated July 16, 1895, together with the codi-
cil, was in truth and fact the last will of Martha A. Keyes;

denies she ever executed any other will as her last will
or that she ever revoked said probated will; denies she
ever took possession of said will purporting to be the
last will of Martha A. Keyes, and thereby prevented her
from destroying it, etc.; denies she knew of the execu-
tion of said alleged will; denies intention to defraud the
complainants and others, or that she attempted to secure
to herself the greatest share of the estate; denies she
used or exercised undue influence or resorted to falsehood
and misrepresentation to induce said Martha A. Keyes
to attach a codicil to said original will; denies she was
under improper restraint and undue influence, and denies
she induced the execution of said codicil without afford-
ing her an opportunity to know or understand the same,
and denies all fraud and undue influence as charged in
the bill.    The answer of defendant Charles E. Kimmel
was filed by his guardian *ad litem.*

Replications were filed to the answers of all defend-
ants.    An order referring the issues of fact to a jury for
trial was made.    A trial was had, the jury finding that
the will dated July 16, 1895, and the codicil thereto, dated
February 26, 1898, were not the last will and testament
of Martha A. Keyes.  A motion for a new trial was made
by appellant, Jessie A. Keyes, which was overruled and
a decree entered setting aside the will and codicil, in ac-
cordance with the verdict of the jury.    An appeal was
prayed by appellant to this court to reverse this decree.

JOHN DAILEY, and GEORGE B. FOSTER, for appellant.

DAN R. SHEEN, and ARTHUR KEITHLEY, for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Errors are assigned by appellant as to the giving of
improper instructions at the instance of appellees, but
those errors are not mentioned or relied upon in the ar-
gument of counsel, and they must be regarded as waived.
A party who alleges error must bring to the attention of

the court what the error is of which he complains, otherwise such errors will not be considered. Where an appellant, in his argument, insists only upon one of several errors assigned, all others will be considered as waived. *Wabash, St. Louis and Pacific Railway Co.* v. *McDougal,* 113 Ill. 603; *Calumet Furniture Co.* v. *Reinhold,* 51 Ill. App. 323.

The only question for determination before this court is whether the evidence sustains the verdict. The rule on questions of this character, as held by this court, is, that the finding of the jury will not be disturbed unless clearly against the weight of the evidence, and cases to contest a will are put upon the same footing with cases at law. *Moyer* v. *Swygart,* 125 Ill. 262.

The evidence shows that the deceased, Martha A. Keyes, was twice married and twice a widow. By the first marriage she had two sons, Charles A. Kimmel and Johnson F. Kimmel. Johnson F. died leaving three children,—two daughters, the contestants Maud F. and Nellie H. Kimmel, and one son, Charles E. Kimmel, a minor. The issue of the second marriage was one daughter, Jessie A. Keyes, the appellant. It appears that the mother and daughter lived together after the death of her husband, Andrew Keyes, in 1858. There is evidence showing that the two sons assisted their mother in managing her property and did much to increase it while at home. In July, 1895, Martha A. Keyes made a will by which she gave to Charles A. Kimmel, the son, and Jessie A. Keyes, the daughter, the greater portion of her property, leaving a small portion to her grandson, Charles E. Kimmel, but practically disinheriting the two granddaughters, giving them only one dollar each. The evidence further shows that Mrs. Keyes had been in poor health, had suffered from disease for several years and had been under the care of a physician. She had a severe attack of pneumonia December 20, 1897, but recovered sufficiently to be around the house a part of the time. She had a relapse of lobular pneumonia on Saturday, February 26, 1898,

and died on the following Wednesday,—four days after she was attacked. She was upwards of seventy years of age, and, weakened by disease and old age, the pneumonia progressed rapidly to a fatal termination.

Martha A. Keyes had made a will in July, 1895, and it appears that on Saturday, February 26, 1898, a codicil to that will was suggested, but by whom the evidence does not show. Mrs. Lucas, her physician, says she drew the codicil herself; that she called Jessie (appellant) and showed her a form she had in a book; that they probably had a conversation about the will; that she appealed to her more or less about it, but does not know just what was said. "I did so because I thought she knew more about doing that sort of work than I did. I think she saw it, but don't know that she read it over. * * * I asked her to get pen, ink and paper, and she did. * * * After I had drawn the codicil she said she did not feel ready to sign it—that she would consider it—and the matter was dropped. I next heard of it Sunday evening from Mrs. Keyes. Mrs. Keyes said, 'I have not read that will yet; if you will read it to me I will sign it to-night.' Then I had the will and read it to her. I did not complete reading it all to her. It was difficult writing for me to read and I did not understand it all, and so I thought I was not reading it in a way to make it clear to her, and I turned and asked Miss Keyes if she would finish it, after, I think, I had gotten pretty well on the third page of it." The next thing was the signing the codicil and procuring the witnesses. She says Jessie went after the witnesses; that they all helped prop her up in bed when she signed the will; that Jessie helped; that she signed the will herself; that she, if any one, steadied her hand; that testatrix's mental condition was normal—was not depressed by disease; that she signed as a witness.

Mrs. Conway testified that Jessie came to the stairs and called her to come down; that she said, "Come down;

hurry;" that she went to the room and signed the codicil
as an attesting witness; that Mrs. Lucas' name was there
when she signed as a witness; that she signed before the
testatrix signed it. Mrs. Lucas says, she does not think
Mrs. Keyes asked them to sign it. Mrs. Conway says
she does not know that the codicil was read over to Mrs.
Keyes; that Mrs. Lucas handed it to her to sign when
she came into the room; that she saw Mrs. Keyes sign
it as soon as the witnesses got through signing it; that
she thinks she knew what she was doing; that she said
nothing, except she was glad it was done.

Mrs. Wyatt was called by proponents and testified that
Jessie A. Keyes came for her; "I did not see that paper
signed by Martha A. Keyes, nor by either of the wit-
nesses, Emma Lucas or Annette Conway. * * * Mrs.
Lucas, Mrs. Conway and the old lady had all signed it
when I went in. * * * Up to that time I had spoken
to no one and no one had spoken to me, except Jessie
told me about being anxious to have the will changed.
* * * After I signed it I did not speak to the old lady
about the will nor she to me. * * * I think she was
all right; sound."

These two witnesses, Mrs. Conway and Mrs. Wyatt,
it appears, were both called to witness the codicil by
appellant, and both put their names to the codicil at ap-
pellant's request, and not at the request of Mrs. Keyes,
the testatrix. While it appears that Mrs. Lucas drew the
codicil at the request of the testatrix, there is nothing
in the record showing that testatrix knew either Mrs.
Conway or Mrs. Wyatt signed the codicil as witnesses.

In November, 1897, Mrs. Keyes went to her son, an
attorney, and desired her will drawn. He referred her
to another attorney, who drew the will, and she depos-
ited it in the Peoria Savings Bank. This will was drawn
without the knowledge of her daughter, Jessie, and re-
voked the will of 1895 by express words. If Mrs. Keyes
was in full possession of her faculties it would seem nat-

ural that she would have spoken about this will of 1897 or referred to it in the codicil. That she did not refer to it cannot but be regarded as a singular circumstance. If her mental condition was such that she forgot about the will of 1897, was she competent to dispose of her property? If she was afraid to tell her daughter, Jessie, of its existence, does it not tend to show that the daughter exercised an undue or improper influence over the testatrix, her mother? The fact that Mrs. Keyes had a will drawn and executed in 1897 expressly revoking the will of 1895 shows that she was not satisfied with the first will. That she had it executed without the daughter's knowledge also shows she was afraid to let her daughter know that she was not satisfied with the will of 1895.

The interviews related by Charles A. Kimmel with the appellant three or four days after the funeral of her mother undoubtedly had much weight with the jury. Charles A. Kimmel testified: "The first time she (Jessie) came to my office she brought an envelope, unsealed. She said to me, 'Mother left a will, and I guess this is the will.' I said to her, 'Jessie, I have heard about that will before; this is the will mother requested you to give her, a good many times, saying she wanted to cancel and destroy it.' She said, 'Well, I could not give it to her because it was lost, and I found it a day or two ago, hidden under the carpet.' I said to her, 'It turned up at an opportune time for you, it seems.' * * * I said, 'I understand that mother made a will some time in November and took it down to Herron's bank,' and at that she (Jessie) went out and said she was going to take it over to the probate clerk's office. * * * I remember one more conversation with Jessie in my office. She came in at this time and said: 'I have been talking with Irwin, and he says if I get a good lawyer and fight pretty hard he thinks I will come out all right yet.' She said, 'The old thing died with a lie on her lips; she sneaked off when I did not know anything about it and had another

will made, but I think I am right if I fight the case.' I said, 'Jessie, don't talk that way; I defended my mother against your father and against your brother; you can't talk that way in my presence about mother; anybody that talks that way is no friend of mine; I don't want to see or hear you any more.' She then went out." To Charles E. Kimmel, her nephew, the minor defendant, appellant said a few days after the funeral and after she had learned of the will executed in November: "The old thing snook off and had another will made without my knowing anything about it, and that I had the other will corrected so the girls will get something." Appellant denies using this language to both Charles A. and Charles E. Kimmel, but she admits she was at her half-brother's office, and that he said "he would not stand any abuse of his mother; that he got awful angry. * * * He said that I had said that she died with a lie on her lips, but I don't remember of ever saying it. If I had said it I would recollect it. He said I abused his mother and did not take care of her properly. I replied, 'You were not there enough to know whether I abused her or took care of her.'"

This language, that "she sneaked off when I did not know anything about it and had another will made," implies that the last will would not have been made had she known her mother was going for that purpose. If a daughter could prevent a mother, when able to be about and not sick, from executing such a will as she desired to make and revoking a former will which was not satisfactory to the mother, would it be unreasonable to assume that she would exert an undue influence to control her when weakened by disease and unable to resist her demands and importunities? The words which the subscribing witnesses say the testatrix used after she had been propped up and had signed the codicil, "I am glad it is done," were significant under the circumstances under which they were made. The testatrix's condition on the evening the codicil was executed is best described

by the witness Mrs. Wyatt. She testified that "she was a very sick woman, but she talked." Mrs. Tamplin said: "I saw her Monday afternoon. * * * I think she died Wednesday of the same week. She seemed to be suffering a good deal. I took hold of her hand and spoke to her. She did not seem to recognize me. Then I said, 'Don't you know me?' and I told her after that who I was, but she did not seem to recognize me at all. * * * She did not recognize the little boy, seven years old. When I came out of the room I told Miss Keyes I was real sorry her mother did not know me, and she said she was under the influence of medicine,—that it was the medicine that caused her to be in that stupor. * * * Charles Kimmel's oldest daughter went into the same room where the old lady was, and the old lady did not recognize her at that time."

As was said in *Purdy* v. *Hall*, 134 Ill. 298 (on p. 308): "Naturally, the mind sympathizes with the body in that which debilitates, and, even when not otherwise impaired, it may become so wearied from long-continued, serious and painful sickness that it is willing to purchase rest and quiet at any price, and when in that condition it is susceptible to undue influence, and is liable to be imposed upon by fraud and misrepresentation. The feebler the mind of the testator, no matter from what cause,— whether from sickness or otherwise,—the less evidence will be required to invalidate the will of such person."

The foregoing testimony shows the condition of the testatrix, both mentally and physically, the day the codicil was executed, and on Monday, the next day after its execution. That it was critical cannot be denied, and the jury undoubtedly were impressed with the belief that from these circumstances in evidence, notwithstanding the testimony of these subscribing witnesses, the testatrix knew but little about the execution of the codicil to revive a will executed in 1895, while she said nothing about desiring to revoke a will deliberately made only

about three months before and deposited in the bank by herself.

On the question of whether it was the testatrix who desired the codicil executed, or appellant, the following testimony is found in the record:   Appellant's own witness, Mrs. Wyatt, testifies that appellant "felt her mother would be near·death and she should not have her die and leave the old will.  The·old will only left the children with a dollar, and she (appellant) said, 'I cannot leave the girls that way.'"   The same witness says that when she had placed the paper to write her name, (as a witness to the codicil,) no one had spoken to her, except "Jessie (appellant) told me, as I have already stated, about being anxious to have the will changed."   Charles E. Kimmel testified that appellant said to him shortly after the testatrix's death, that "she had the other will corrected so the girls (my sisters) would not be cut out."   Maud Kimmel Huff swears that on the Wednesday morning that her grandmother (testatrix) died, Mrs. Wyatt came over and said, "Jessie, you had better lie down."   Jessie went into the bedroom and laid down, and I heard her say to Mrs. Wyatt she was glad she.had her mother do that, Sunday night.   While Mrs. Wyatt, in rebuttal, says she does not remember that appellant made use of this expression testified to by Maud Kimmel Huff, she does not swear she did not say it, and appellant does not deny making these statements to Mrs. Wyatt, her own witness.

This testimony, taken in connection with the circumstances attending the execution of the codicil; the weak and serious condition of the testatrix; the insufficiency of the evidence to show that the testatrix requested two witnesses to sign the·codicil as witnesses, or that she acknowledged to the witnesses that it was her desire to have the codicil become a part of her will; the fact that' appellant's interest will be increased largely if the codicil is sustained, must have satisfied the jury that the will of July 16, 1895, and the codicil dated February 26, 1898,

were not the last will and testament of Martha A. Keyes, but of appellant. Where a will is procured to be written by persons largely interested in it, it is a circumstance to excite a stricter scrutiny and requires stricter proof of volition and capacity. *McCommon* v. *McCommon*, 151 Ill. 428; *Purdy* v. *Hall, supra;* 1 Taylor on Evidence, sec. 160.

It is unnecessary to further discuss the evidence in this record. The evidence is conflicting, and some portions seem irreconcilable. The judge who tried the case was satisfied with and acted upon the verdict, and it must be presumed he was satisfied with the finding. A careful consideration of the evidence does not show that the finding is clearly against the evidence. What was said in *Calvert* v. *Carpenter*, 96 Ill. 63, is peculiarly applicable in the case under consideration. We there said (p. 67): "It can scarcely be repeated too often, that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court sitting as a court of review. All we can do is to follow with the eye the cold words of the witness as transcribed upon the record, knowing, at the same time, from actual experience, that more or less of what the witness actually did say is always lost in the process of transcribing. But the main difficulty does not lie here. There is an inherent impossibility of determining with any degree of accuracy what credit is justly due to a witness from merely reading the words spoken by him, even if there were no doubt as to the identity of the words. However artful a corrupt witness may be, there is generally, under the pressure of a skillful cross-examination, something in his manner or bearing on the stand that betrays him and thereby destroys the force of his testimony. Many of the real tests of truth by which the artful witness is exposed, in the very nature of things cannot be transcribed upon the record, and hence they can never be considered by this court. For this reason the rule is

firmly established, that where, as in this case, there is an irreconcilable conflict in the testimony, this court will not reverse the judgment of the trial court where the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict."

The decree of the circuit court will be affirmed.

*Decree affirmed.*