JAMES E. LEONARD

*v.*

EMMA J. BURTLE *et al.*

*Opinion filed April 18, 1907.*

1. WILLS—*what proof establishes prima facie a charge of undue influence.* Proof that the testatrix, who was old and feeble, reposed great confidence in her son, who acted as her agent, and that the latter procured his attorney to draw the will, and that the son and the attorney were alone with the testatrix at the drawing and execution of the will, which made the son practically the only beneficiary of a large estate, whereas the other children and grandchildren were given but small amounts, establishes *prima facie* the charge of undue influence by the son.

2. SAME—*when instruction as to undue influence does not conflict with rule as to burden of proof.* An instruction in a will contest stating that where it appears the chief beneficiary of the will enjoyed the trust and confidence of the testatrix and caused the will to be prepared a presumption of undue influence arises, which must be overcome by other evidence in the case that the execution of the will was the free deliberation of the testatrix, is not in conflict with the rule that the burden of proof, upon the whole case, is on the contestant, since the presumption fails if there is evidence of free agency.

3. SAME—*what is not error as to manner of submitting issue at law.* The fact that the issue at law in a will contest not only submits to the jury the question whether or not the instrument was the last will and testament of the testatrix, but also submits the questions whether the testatrix possessed testamentary capacity and whether undue influence was exercised, does not constitute error in the manner of submitting the issue at law to the jury.

4. COSTS—*when costs may be awarded against an executor individually.* Where a will is contested upon the ground of want of testamentary capacity and also for alleged undue influence by the executor, who was the chief beneficiary of the will, and both issues are found in favor of the contestants, the court may, in its discretion, award costs against the defendant individually, and not in his capacity as executor.

APPEAL from the Circuit Court of Sangamon county; the Hon. O. P. THOMPSON, Judge, presiding.

E. S. ROBINSON, HAMILTON & CATRON, and SHUTT, GRAHAM & GRAHAM, for appellant.

McANULTY & ALLEN, GEORGE A. WOOD, and CLAYTON J. BARBER, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

On September 21, 1905, the appellees, Emma J. Burtle and others, filed their bill in the circuit court of Sangamon county against the appellant, James E. Leonard, to contest the validity of an instrument purporting to be the last will and testament of their mother, Ermina M. Valentine. The bill alleged that at the time of the execution of said instrument the testatrix was not of such sound mind and memory as to be capable of executing the same, and also that she was under the improper restraint and influence of the appellant, James E. Leonard. Upon answer being filed an issue of law was formed, and upon a trial before the court and a jury a verdict was returned finding that the instrument in question was not the last will and testament of the testatrix; that at the time of the execution of the same she was not of sound mind and memory and was unduly restrained and influenced by the appellant, James E. Leonard. A decree was rendered in accordance with the verdict, setting aside the will, to reverse which an appeal has been prosecuted to this court.

Two principal questions are first presented for decision, namely, whether or not, at the time of the execution of the instrument, the testatrix was of sound mind and memory; and secondly, whether she was unduly influenced by appellant in making the same.

The evidence shows that at the time of her death, on August 19, 1905, the testatrix was about sixty-eight years of age. Prior to 1904 she had been a strong and healthy woman, but some time during that year she was stricken with paralysis, which affected one side of her body, and she

was under a physician's care for several weeks. Her heart was affected and she suffered somewhat from asthma. After this first attack, however, she recovered to a considerable extent, but in April, 1905, she suffered another stroke, and in addition to heart trouble she was in a dropsical condition. She was attended by a physician for four or five weeks after the last attack and was during most of the time in almost a helpless condition. She lived in her own home in Divernon, Illinois, and during a part of her sickness was attended by her two daughters, Mrs. Jones and Mrs. Burtle. While they were at the house Mrs. Burtle took to the bank in Divernon a package containing some papers and other articles of value belonging to her mother and left them with the cashier, with instructions to keep them until she (Mrs. Burtle) called for them. A short time after this, while the testatrix was still confined to her bed, she executed a power of attorney, in which she authorized her son, the appellant herein, James E. Leonard, to take charge of and manage her property. By virtue of this authority the bank of Divernon delivered the package left by Mrs. Burtle to him. There is evidence in the record tending to show that the daughters were very much opposed to the execution of the power of attorney and to the surrender to the brother of the said package, and a controversy arose between the parties, accompanied by more or less unfriendly feeling. The two daughters left the home of their mother and went back to their own homes in Springfield, and immediately afterwards, on April 19, 1905, they made application to the probate court of Sangamon county for the appointment of a conservator for their mother, but the application was subsequently dismissed without further action. In the latter part of the same month the testatrix, and a young grand-daughter who was living with her, were removed by James E. Leonard, the appellant, to his home near Pawnee, a few miles from Divernon. In June he and his mother went to a bank in Springfield and had new certificates of deposit drawn for

the money held there under former certificates of deposit in favor of the testatrix. In the latter part of the following July the grand-daughter, Bertha Shumaker, who had been living with her grandmother, died, and the testatrix attended her funeral, but the evidence shows that at that time she was physically very weak and had to be assisted to and from the church. On the 31st of that month the physician who had been attending her, after an examination, told the appellant that she was not likely to live many days, and he called again on August 3, when the will was executed. It appears from the evidence that after visiting her professionally on that day he waited in another room, at the request of the son, for two hours or more while the will was being drafted, and then, at the request of the appellant, he signed the instrument as one of the attesting witnesses. The testatrix died August 19 and the will was admitted to probate September 21, 1905. She died seized in fee of three lots in the village of Divernon, free from encumbrance, worth about $2500 or $3000. She also had on deposit in a bank in Springfield $15,722 in cash and owned other personal property, making a total of between $22,000 and $25,000. She had but the one son, the appellant, and two living daughters, Mrs. Burtle and Mrs. Jones, the appellees, both married and living with their families in the city of Springfield. Two other daughters were deceased,—one, Mrs. Reichert, leaving three children, and the other, Mrs. Shumaker, leaving seven children. The will devised to each of the two living daughters one-half of the three lots in Divernon for life with remainder in fee to their respective children. To each of the three Reichert children the sum of $150 was given and to each of the Shumaker children $100. All the rest and residue of the estate, after the payment of debts, was devised and bequeathed to the son, James E. Leonard, who was also named as executor.

The evidence as to the mental condition of the testatrix is very conflicting and confined to a short period of time.

Prior to 1904, as already stated, she was a strong, healthy woman, and no question is made as to her testamentary capacity previous to that time. Her affliction,—that is, paralytic attacks,—was evidently, according to the testimony of her attending physician, occasioned by blood clots on the brain, which not only affected her bodily movements, but interfered with her powers of speech and materially affected her mind. The evidence, however, as to her mental condition is admittedly in irreconcilable conflict, but we think, when fairly and impartially considered, it preponderates in favor of the finding of the jury, and that the verdict and judgment setting aside the purported will upon the ground of mental incapacity alone should be sustained.

But even if this conclusion is unsound, we are convinced that the evidence adduced is clearly sufficient to show such undue influence on the part of the appellant as to justify the finding and decree of the court below. The evidence strongly tends to show that the appellant was guilty of such conduct as would establish a fraudulent purpose in dealing with his mother's property and affairs. Shortly after the death of the testatrix he qualified as executor under her will, and although he knew about the certificates of deposit in the Springfield bank, amounting to nearly $16,000, he only listed personal property to the amount of about $4300, and in a letter written to one of the grandchildren he manifested undue feeling in the matter of the estate, and in the letter said, among other things: "Since then a will *was found* and probated which names me as the executor. I know more about her business than any living person, and I will tell you she has done well by all, which you will all learn. * * * No, boys, the estate is worth nothing to what they say. I want to know if you boys have been entrapped into throwing your hard-earned money away in paying high-priced lawyers and court costs in trying to get something that is not in existence. Please answer. Now, boys, I have a warm feeling for you. If you three oldest

ones are ready, I can send you your money. Answer by return mail, for I must know that you want your money."

Prior to the time Mrs. Burtle took the papers and other valuables to the bank there seems to have been no manifestation of trouble between the heirs, although Charles Reichert, the husband of one of the deceased daughters, testified that as early as 1896 appellant said to him "that he [the son] would see that they [the Reicherts] would get but damned little more in the end, when the time came, of his mother's estate." It does, however, very clearly appear that as soon as appellant learned that his sister had taken the papers and valuables to the bank, trouble arose between him and his living sisters. He went to his mother's home and obtained from her the power of attorney, which was contrary to the wishes of his sisters. On the date that power of attorney was executed, April 18, 1905, the mother was quite sick as the result of the second stroke of paralysis and was confined to her bed, and had to be propped up to sign the paper, even with her mark. Just what was said and done at that time does not fully appear, but it is shown that in her enfeebled condition of body and mind the appellant obtained from her the power of attorney, which placed in his absolute control all of her property, both real and personal, which power and authority he continued to exercise until the day of her death. Shortly after the execution of that power he removed her to his home, where she continued to live until she died. Between those dates she improved somewhat in health, but it is clear that she was in a very feeble condition physically and more or less afflicted mentally, and that she was under the constant control of appellant and his family. On July 31, but a few days before her death, Dr. Duncan, the attending physician, visited her and then told the appellant that his mother could survive but a short time. The son immediately sent for his attorney to prepare the will, and he and the attorney were in the room with the testatrix alone, with the doors closed, for about

two hours while the will was being drawn. There is no evidence whatever as to what took place during that time, and while the two persons who signed as witnesses testified to facts sufficient to make a *prima facie* case admitting the instrument to probate, their testimony is not of the most satisfactory character. The evidence as to the circumstances under which the will was executed impresses the mind with a suspicion, to say the least, that appellant was not willing it should be done openly, but rather in a secret manner. After her death his conduct was wholly inconsistent with fairness and open dealing with his sisters and the other heirs. He first stated that the personal estate was of about the value of $3500, and when required by the county court to file an inventory he only reported $4300, and finally, after being required to file a complete inventory, he raised that amount to $20,000. He also pretended to the other parties interested in the estate that he had suddenly discovered or found the will, when, as a matter of fact, he knew all about its existence and where it was, having himself had it prepared by his own attorney before it was executed. No one will seriously contend that his conduct prior to and subsequent to the death of his mother was consistent with that fairness and candor towards her and his sisters and the other heirs which would ordinarily be expected. He knew that by reason of the two strokes of paralysis and her advanced age she would naturally be looked upon as of doubtful testamentary capacity, in a condition of mind and body to be more or less easily influenced by those closely associated with her, and the ordinary impulses of fair dealing, both towards her and her heirs, would have dictated that if she desired to make a will those interested should be notified and at least given an equal opportunity with himself to express their wishes and desires. On the contrary, he took charge of her at the near approach of death, and closeted in a room with his own legal adviser at least suffered the will to be made. If the jury had found, from these facts

alone, that the will was procured by undue influence, and
the chancellor had approved of that finding by entering a
judgment upon the verdict, no court, it seems to us, would
willingly interfere with that finding.

But there were fiduciary relations existing between the
appellant and his mother. Proof of the fiduciary relation,
together with the facts that appellant, in whom trust and
confidence were reposed by his mother, procured his attor-
ney to prepare the will, that appellant and his attorney were
alone with the testatrix when the will was drawn, and that
appellant was practically the only beneficiary of a consider-
able estate, established *prima facie* the charge of undue in-
fluence. (*Weston* v. *Teufel,* 213 Ill. 291.) The *prima facie*
case was not overcome. The execution of both the power
of attorney and will were surrounded by such facts and
circumstances as rendered them questionable. There is no
reason apparent why the mother should want to discriminate
against her daughters or leave her dependent grandchildren
with a mere pittance by giving the bulk of her estate to her
son. He was a man of mature years, able-bodied and ca-
pable of making a living for himself, and he seemed to have
considerable property of his own. Until the date of her last
sickness the mother had made no will similar to the one in
question, and no intention of that kind had been manifested
by either word or deed. Especially in her condition, the son
having obtained by the will the bulk of her property, he be-
ing at the same time her agent with full control of her es-
tate, he was bound to show absolute good faith on his part
and prove affirmatively that the will was executed without
any undue influence on his part.

In view of all of the facts and circumstances surround-
ing the case we think the jury were amply justified in find-
ing that at the time the will was executed the testatrix was
unduly and improperly influenced by appellant.

It is next insisted that the court erred in giving the first
and seventh instructions on behalf of appellee. They told

the jury, as a matter of law, that where a person receives
the larger share of the property of a testator by his will, or
the will is made for the chief benefit of such person in whom
the maker reposes confidence and trust at the time of the
execution of the will, and that such beneficiary causes the
will to be prepared, then a presumption of law arises that
the will was procured by the undue influence of such bene-
ficiary, which presumption must be overcome by other evi-
dence in the case that the execution of the will was the result
of the free deliberation and judgment of the maker. It is
urged that neither of these instructions required that it shall
be shown by the evidence, or that the jury shall believe from
the evidence, that the existence of such supposed facts upon
which the presumption is predicated caused the testator to
make such a will, but the jury are told that the bare exist-
ence of these facts, although they may not have operated on
the mind of the testator so as to cause him to make the will,
raises the presumption of undue influence on the part of the
beneficiary; and it necessarily follows that upon proof of
the circumstances therein stated the burden of proof shifts,
and before the proponent of the will may have a verdict in
his favor he must show by affirmative evidence that he ex-
ercised no undue influence to procure the execution of the
will. We do not think the instructions are capable of the
interpretation placed upon them. It was not the intention
of the court, in giving them, to lay down a rule of law ap-
plicable to all the facts in the case, but simply a rule of law
with reference to undue influence arising from a fiduciary
relation existing between the parties. The decisions of this
court are clear that the doctrine whereby this presumption
arises is perfectly consistent with the rule which places the
burden of proof of the whole case on the contestant. The
presumption is merely *prima facie;* the burden of proof al-
ways remains the same as to the whole case. The presump-
tion fails if there is evidence of free agency and deliberate
judgment on the part of the testatrix, and the jury were so

instructed in this case. The preponderance of the evidence may not support the presumption, and the jury were repeatedly instructed that the charges of undue influence and mental incapacity must be proven by a preponderance of the evidence. The first, third, fourth, fifth, eighth, tenth and twelfth instructions given at the request of the proponent so informed the jury. The instructions in question did not tell the jury that a presumption of undue influence did exist, but only under what conditions of proof it would arise.

It is next insisted by the appellant that the instructions given to the jury on behalf of appellees did not clearly define what was meant by undue influence, and complaint is also made of other instructions with reference to the testamentary capacity of the testatrix. What constitutes undue influence depends upon the circumstances of each case. To make a good will a person must be a free agent. But all influences are not unlawful. The doctrine of equity, however, concerning undue influence is broad, and it will reach every case and grant relief where influence is acquired and abused and confidence is reposed and betrayed. (*Smith* v. *Henline,* 174 Ill. 184.) While it may be true that some of these instructions, standing alone, might be subject to some of the criticisms made against them, yet taking them as a whole and considering them as one series, as we must, we think they fairly and reasonably presented to the jury the law with reference to mental capacity and undue influence, and the jury were in no way misled by them and all of the rights of appellant were subserved in that respect.

It is next insisted that the court committed error in entering a judgment for costs against James E. Leonard individually. It is insisted that it was his duty, as executor under the will, to defend it, and that the costs of a contest are not properly chargeable against him. The bill in this case was filed upon the ground of undue influence exerted by appellant over the testatrix, and also upon the ground of mental incapacity of the testatrix to make the will. Both

of these issues were found against appellant, and the court was justified, in the exercise of a sound discretion, in awarding costs against appellant individually. *Shaw* v. *Moderwell,* 104 Ill. 64; *Moyer* v. *Swygart,* 125 id. 262.

It is next insisted that section 7 of chapter 148 of our statutes provides that upon the contest of a will an issue at law shall be made up, to be tried by the jury, as to whether the instrument in writing purporting to be the last will of the decedent is, in fact, such last will. It is insisted that in the trial of this case no issue at law was made up or submitted to the jury. In this respect we think appellant is in error. An issue at law was made up which not only submitted to the jury the question as to whether or not the instrument presented was the last will and testament of the testatrix, but also submitted to the jury the two questions as to whether or not, at the time said instrument was executed, the testatrix was of sufficient mind and memory to execute the same, and whether, at the time of said execution, she was unduly influenced by appellant. All of these questions were answered against the contention of appellant. We do not think there was any error in the manner in which the question was presented for the consideration of the jury. *Harp* v. *Parr,* 168 Ill. 459; *Brown* v. *Miner,* 128 id. 148; *Buchanan* v. *McLennan,* 105 id. 56.

Complaint is also made of the ruling of the court in the admission of evidence. We have carefully considered these various questions presented, and are of the opinion that the record as presented is remarkably free from error and that the court did not rule to the prejudice of appellant.

We find no reversible error, and the decree will be affirmed.                                    *Decree affirmed.*