(No. 32752.—

KATIE MITCHELL, Appellee, *vs.* E. B. "BRUFF" VAN SCOYK, Exr., *et al.*, Appellants.

*Opinion filed September 24, 1953—Rehearing denied Nov. 16, 1953.*

KENNETH A. GREEN, of Mattoon, for appellants.

BENNETT & BENNETT, of Marshall, and C. A. WILLIAMS, of Casey, for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Clark County finding and declaring that certain instruments purporting to be the will and codicil of Samuel James, deceased, are not his will and codicil, setting aside said instruments and declaring the probate thereof null and void. The decree was entered upon the verdict of a jury and in conformity with its findings in an action brought by appellee, Katie Mitchell, a daughter of the deceased and his sole heir, to contest the will and codicil of Samuel James. The defendants in the circuit court were E. B. "Bruff" Van Scoyk, individually and as executor of said purported will and codicil, Martha Spear, the Presbyterian Church of Mattoon, Illinois, the Baptist Church of Westfield, Illinois, Edmund Ramey, Doit Biggs, and Kenneth A. Green. Only the executor and Martha Spear have appealed.

Samuel James died at Westfield on August 29, 1950, and the instruments putporting to be his will and a codicil thereto were admitted to probate in the county court of Clark County on September 29 of that year. The will bears the date of October 11, 1949, and the codicil is dated December 3, 1949. The will gives to Martha Spear, a sister of the deceased, all of deceased's personal property (except a bequest of $500 to the Presbyterian Church of Mattoon) as well as a 120-acre farm in Clark County. The will devises 40 acres of land in Coles County to the daughter,

Katie Mitchell, provided that she does not contest the will, and further provides that if she brings any proceeding to contest, the 40 acres shall be sold and the proceeds paid to the Baptist Church of Westfield. The instrument provides that if Martha Spear predeceases the testator or "die before distribution of the devise and bequest to her has been made and before the time when her receipts for said distribution are filed with the proper court," then $2000 of the amount bequeathed to her shall be paid to Edmund Ramey and the entire balance to "my good friend E. B. "Bruff" Van Scoyk, who lives in Westfield, Illinois." The will names E. B. "Bruff" Van Scoyk as executor and provides that in the event he is unable to serve or declines, Doit Biggs shall be successor executor. The instrument further directs that the executor employ as his attorney, Kenneth A. Green, an attorney at law of Mattoon. The codicil in question contains no changes or additions. It states that the testator, "feeling that it would be well at this time to re-state, ratify and confirm the provisions of said last will and testament, makes the codicil." The codicil recites that testator has studied the provisions of the will immediately prior to executing the codicil and is satisfied with its provisions and that he therefore re-states, ratifies and confirms each and every provision of the instrument referred to. The will was witnessed by Mary and Newton Leith of Westfield and Ila Mae Bingaman of Mattoon, the secretary of attorney Kenneth A. Green who prepared the will. The codicil was witnessed by Robert and Virginia Shawver of Westfield. All of the witnesses to the will were witnesses at the trial in the circuit court but neither witness to the codicil testified. None of the persons named in the will was related to deceased except Martha Spear and Katie Mitchell.

The complaint filed in the circuit court alleges that Samuel James was not of sound mind and memory at the time of the execution of the instruments and that the will and codicil were procured by the undue influence and

fraudulent misrepresentations of Martha Spear and E. B. "Bruff" Van Scoyk, setting forth particularly the acts of undue influence and fraudulent misrepresentations complained of. The answer of the defendants is in form a general denial, except that the Baptist Church of Westfield has filed a disclaimer so that the property which might come to it would revert to the estate and to Katie Mitchell as sole heir of the deceased. The cause was tried twice before a jury. At the first trial the jury was unable to agree. Upon the second trial the jury reached a verdict finding the issues for the plaintiff and that the will and codicil in evidence were not the last will and testament and codicil of Samuel James, deceased. At the trial defendants made motions for a directed verdict generally and upon the issues of unsoundness of mind and undue influence separately, both at the close of plaintiff's case and after defendants had introduced their evidence and rested. These motions were overruled. Motions for judgment notwithstanding the verdict, in arrest of judgment and for a new trial were also made but were denied by the trial court. Numerous assignments of error have been made but only those argued will be considered as assignments of error made, and those not argued will be deemed to have been waived. (*Horner* v. *Jamieson,* 394 Ill. 222; *Creighton* v. *Elgin,* 395 Ill. 87; *People ex rel. Nelson* v. *Olympic Hotel Building Corp.* 405 Ill. 440.) The principal assignments of error to be considered here are (1) denial of the motions for directed verdict and for judgment notwithstanding the verdict, (2) that the verdict is not supported by the evidence as a whole, and (3) errors assigned upon the admission and exclusion of certain evidence.

Preliminary to a discussion of these various assignments of error it will be well to state some of the undisputed facts which are established by the evidence on both sides of this controversy. Samuel James was 91 years of age at the time of the execution of the purported will and

codicil. Had he lived another month he would have been 92 years of age at the time of his death. During his lifetime he had acquired considerable money and property so that at the time of his death his estate was valued at about $50,000. The value of the 40 acres bequeathed to his daughter, Katie, is about $5400. The value of the remainder of the estate, all of which was to go to his sister, Martha Spear, and on certain contingencies to Van Scoyk, was valued at $44,332.37. These amounts exclude more than $12,000 transferred to Martha Spear in 1949 during his lifetime. Though of considerable means, Samuel James had always lived frugally and dressed poorly. He had been somewhat eccentric, preferring to "batch it" in a small shack on his farm rather than associate with others. In the later years of his life he had lived with his sister, Martha Spear, in a home in Westfield which they owned together. He had never owned an automobile but travelled between his farm and Westfield in a mule-drawn wagon. This he did up to the time he was about 89 years of age.

The health of James had been fairly good up through the year 1947 but during the year 1948 it began to decline rather rapidly due to his advanced age. He was bothered with a kidney and bladder ailment and had trouble controlling his bowels. He is described by some witnesses during the year 1948 as being filthy and dirty and given to filthy habits. He last visited his farm in the fall of 1948 at which time, according to one of defendants' witnesses, he could not walk "to do any good." This same witness stated that James had trouble getting around from 1947 onward and that his walking did not improve any from 1948 until the time of his death.

During the entire year of 1949 and from then on until his death it appears that James was confined to the house in Westfield where he lived with his sister. He is described by witnesses for both sides, who observed him during this period, as a feeble old man. His bed was in the kitchen

of the house and he had to be helped from his bed to a chair where he sat and back to bed again. No witness ever saw him out of this room from the beginning of 1949 until the time of his death. Dr. L. H. Johnson, who testified as a witness for defendants, stated that he attended James at the home on February 18 and March 2, 1949, and on February 26 and August 28, 1950. He states that at the time of his visits in 1949 he had little conversation with James because he was too sick. The doctor stated that he had bladder and kidney trouble at that time together with an infected ear and was running a high temperature. He states that he could not make James hear.

It was on March 1, 1949, and during the period Dr. Johnson testifies, that James was so ill that his sister, Martha Spear, appeared at the Casey National Bank at Casey, Illinois, with a blank check signed by James. This she caused to be filled in with the entire amount on deposit in James's name at that bank and closed his account, depositing the entire sum of $12,241.40 in her account. Two or three weeks previous to this transaction she had inquired of the banker at this bank as to the procedure necessary to transfer the account to her and he had explained that it could be done only upon James's signature.

Prior to the early months of 1949 it appears that James's relations with his daughter, Katie Mitchell, were friendly. She had washed his soiled clothing for him and there is nothing in the evidence which shows that their relations had been other than the normal relations of a father and daughter. Mrs. Mitchell, upon being advised of the transfer of the large sum from her father to Mrs. Spear, brought proceedings in the county court of Clark County for the appointment of a conservator for James. In connection with these proceedings, his bank accounts in several banks, except that in the bank at Westfield, were temporarily closed. Upon appeal, the conservatorship proceedings were finally dismissed by order of the circuit court of Clark

County on November 15, 1949. The conservatorship proceedings were therefore pending at the time of the execution of the will and the date of the dismissal intervened between the date of the execution of the will and that of the execution of the codicil. At the time the proceedings were instituted by Mrs. Mitchell, Mrs. Spear told a witness in the presence of James that "Katie has closed our bank accounts and we have nothing to live on." This impression apparently stayed with James because in the winter of 1949, after the conservatorship proceedings had been dismissed, he told an old friend of his who called to see him that "Katie Mitchell had broke him." The evidence shows that after the conservatorship proceedings were begun the relations between Katie Mitchell and Martha Spear became strained and embittered and that, largely because of the interpretation Martha Spear saw fit to give those proceedings, Samuel James became very angry at his daughter and sole heir. He told a friend that if Katie had just waited until he died he would have seen that she was taken care of, apparently believing that Katie, through the conservatorship proceedings, had sought to acquire the money for herself.

Turning to the assignments of error, we shall first direct our attention to the refusal of the trial court to direct a verdict upon the issue of unsoundness of mind. The legal rules applicable to such a motion in proceedings of this character have often been stated by this court. A will contest is a statutory proceeding and not an ordinary action in chancery. Motions for a directed verdict or for judgment notwithstanding the verdict in a will contest are subject to the same rules governing those motions in an action at law. (*Wiik* v. *Hagen,* 410 Ill. 158; *Tidholm* v. *Tidholm,* 391 Ill. 19.) The rule is that where the evidence, together with all reasonable inferences to be derived therefrom, taken in the aspect most favorable to the plaintiff, is sufficient to establish the allegations of the complaint, the

defendant is not entitled to a judgment notwithstanding the verdict. (*Wiik* v. *Hagen,* 410 Ill. 158.) Likewise, since both types of motion are subject to the same operating principle, where the evidence, taken in its aspects most favorable to the contestant, together with all reasonable presumptions and inferences to be drawn therefrom, tends to establish the allegations of the complaint, the issue should not be withdrawn from the jury. (*Tidholm* v. *Tidholm,* 391 Ill. 19; *Peters* v. *Peters,* 376 Ill. 237; *Ginsberg* v. *Ginsberg,* 361 Ill. 499.) Neither the trial court nor this court is permitted to weigh the evidence, the sole question being whether the plaintiff's evidence makes out a *prima facie* case, sufficient in itself to go to the jury.

Five witnesses testified for the plaintiff that in their opinion James was of unsound mind at the time they observed him. All of these witnesses had known James personally over a long period of time. One testified as having observed him as late as October 8, 1949, three days before the execution of the purported will. All of them had seen him and had conversed with him either late in 1948 or during 1949. James had told one of these witnesses, the mayor of the village of Westfield, that he was not able mentally or physically to do business any more, indicating a consciousness of his own failing faculties. Edward Turner, a banker of Casey, who last saw James on May 24, 1949, had done considerable business with James previously. Turner testified that he visited the home at the time the conservatorship proceedings were started; that while Mrs. Spear was very angry, Sam was not interested, failed to answer questions and "was perfectly at sea." Turner testified that Mrs. Spear became very angry at Sam for his indifference. Ezra Riggins who last saw James on April 1, 1949, says that James sat with his head down and when he looked up became glassy-eyed and stared; that James said nothing when Martha Spear refused to allow James to accompany Riggins to the home of Katie Mitchell. Mrs.

Simpson who called on James on October 8, 1949, testified that James did not recognize her until she told him who she was though she had known him for 43 years. This is but a very brief summary of the testimony of some of the witnesses for the plaintiff on the issue of testamentary capacity. Viewing it as a whole we are persuaded that it was sufficient to make out a *prima facie* case and was sufficient of itself to go to the jury on that issue. The trial court did not err in refusing to take the question of unsoundness of mind from the jury.

Upon the issue of undue influence the trial court made the same ruling, which is also assigned as error. We believe that the evidence offered on behalf of plaintiff upon this question is even more convincing. It leaves little doubt that there was a strong fiduciary relationship between Martha Spear and her brother, Samuel James, during the last two years of his life and at the time the will and codicil were executed. During all of this time she did all of his business for him with the possible exception of one small transaction of leasing some pasture which, incidentally, may be regarded as a deal of questionable benefit to James. Martha Spear opened an account for James in the Westfield Bank in 1948. James never came to the bank. She made all deposits and withdrawals, though the withdrawals were made upon checks signed by him. He depended upon her to care for his physical needs and handle his legal affairs. Though, according to Turner, James took no interest in hiring an attorney to defend the conservatorship proceedings brought by Katie Mitchell, it was Martha Spear who went to Mattoon to hire a lawyer and it is she who appears as the active party in defending that lawsuit, together with E. B. "Bruff" Van Scoyk, who first contacted attorney Green for the defense of that case in the circuit court and the ultimate drafting of the will. It was in April of 1949 that Samuel James transferred his interest in the home in Westfield to Martha Spear. Thereafter she was the sole owner of the

property in which they lived. During the entire summer and fall of 1949 it appears that James was dependent upon Van Scoyk and his sister for care and advice, though there is some evidence that prior to that time Van Scoyk and James had had differences and were not close friends. The inference is clear that Van Scoyk became closer to Samuel James in 1949 than he had ever been before.

There can be little doubt that as between her brother and herself, Mrs. Spear was the dominant party. When the papers in the conservatorship proceedings were served, she stated in Samuel James's presence that "Katie needed killing" and "I told you never to let her know anything about your business." Turner, who was present at that time, says he questioned Mrs. Spear about the transfer of the account in the Casey bank; that she first denied that there had been any transfer and later said to James, "Lets fess up that you did transfer the money to me." To this James said nothing and appeared entirely disinterested. During the summer of 1949 Mrs. Spear denied admittance to several friends of Samuel James who came to see him, though it appears that several persons, who testified in the conservatorship proceedings and in the will contest case for the defendants, came to the home, observed and conversed with Samuel James in the fall of 1949 upon the invitation of Martha Spear. Some of these people had known James but had never been in the house before and some had not seen James for a period of years. During the summer and fall of 1949 Mrs. Spear also refused admittance to Katie Mitchell. On one occasion when she did admit her she told her to "come in and take her medicine," and a witness who accompanied Katie Mitchell at the time says she heard Martha Spear's voice raised in anger thereafter, this happening in the presence of James. Mary Simpson, who had been refused admittance previously by Martha Spear, went to the home with Hannah Barnett on October 8, 1949, and found Samuel James alone. He invited them in and they

conversed with him. When Martha Spear arrived and found them there she was at first very angry, but later conversed with them. At this time she appeared over-concerned about her brother's mental condition, asking the visitors repeatedly if they did not think him to be of sound mind and if they did not think he was "mighty good" for one of his age.

Concerning the drafting and execution of the will itself, it appears that Martha Spear was present at all times during the discussion as to what the will should contain. Those present at this conference were Samuel James, Mrs. Spear, Kenneth A. Green, the attorney who drafted the will, and Ila Mae Bingaman, his secretary. This discussion and the preparation of the document lasted most of an afternoon, as the witnesses, Newton Leith and his wife who witnessed the will with Miss Bingaman, were not called in by Mrs. Spear until about 3:30 or 4:00 o'clock. The attorney and his secretary were there from 1:00 o'clock P.M. until 4:30 o'clock P.M. The will was prepared and executed in the kitchen of the Spear home. It is undisputed that Martha Spear had by prearrangement secured the Leiths as witnesses. Though neighbors, they were not acquainted with Samuel James and had never even seen him prior to the actual execution of the will which had been prepared before they arrived. It is also undisputed that Martha Spear participated to some extent in the discussion as to the contents of the will, among other things suggesting that there be a legacy of $500 to the Presbyterian Church of Mattoon in memory of her daughter. It was also testified that when James stated he wanted to leave everything to Mrs. Spear except the 40 acres, she suggested that he give Katie $10,000, but that he declined. As to the execution of the codicil, Mrs. Spear testified that she was present; that she does not remember but thinks that Green was there and that she could not recall anyone else who was there, as she had had too much on her mind to think of it again. As previously indicated the record shows that the codicil was

witnessed by Robert Shawver and Virginia Shawver, who did not testify.

Prior to the date of the execution of the will it appears that Martha Spear and E. B. "Bruff" Van Scoyk had participated actively in securing attorneys to represent James's interests, one of them being the attorney who eventually drafted the will. The testimony is positive that Green was first contacted by Van Scoyk and one Roscoe Biggs, the father of Doit Biggs, named as alternative executor. It thus appears that Martha Spear and E. B. Van Scoyk, both of whom were to benefit materially and extensively by the will and who occupied a fiduciary relationship with James, were connected with the making of the will, though Van Scoyk was not present at the time of its execution.

This court has said that the active agency of the chief beneficiary in procuring a will especially, in the absence of those having equal claim on the bounty of the testator, who was enfeebled by age and disease, is a circumstance indicating the probable exercise of undue influence. In that connection we have observed that a mind wearied and debilitated by long-continued and serious illness is susceptible to undue influence and liable to be imposed upon by fraud and misrepresentation; that the feebler the mind of the testator, no matter from what cause, whether from sickness or otherwise, the less evidence will be required to invalidate the will of such person. (*Donnan* v. *Donnan,* 256 Ill. 244; *England* v. *Fawbush,* 204 Ill. 384.) In *Sulzberger* v. *Sulzberger,* 372 Ill. 240, we stated that under such circumstances one who benefits largely from a will made through his agency, in the absence of others having an equal claim to testator's bounty, is faced with the presumption that he exercised undue influence, and the strength of the presumption depends on the condition of the testator's mind when he made the will. *Friberg* v. *Zeutschel,* 379 Ill. 480, is to the same effect. The principles announced

in these cases operate irrespective of the existence of a fiduciary relationship between the chief beneficiary and the testator. We believe that the facts set forth above are sufficient to bring this case within the above announced principles and to raise such a presumption. But we believe the plaintiff's case is further strengthened by the evidence of a fiduciary relationship between the parties. Where a fiduciary and dominant party, in whose behalf a will is drawn, is directly connected with the making of the will by its preparation or by participating in its preparation and execution, proof of these facts establishes *prima facie* the charge that the will resulted from undue influence exercised by the beneficiary. (*Wiik* v. *Hagen,* 410 Ill. 158; *Dial* v. *Welker,* 328 Ill. 56; *Gum* v. *Reep,* 275 Ill. 503; *Yess* v. *Yess,* 255 Ill. 414; *Leonard* v. *Burtle,* 226 Ill. 422.) We find that, under either of the principles discussed above, the evidence adduced in this case was sufficient to go to the jury upon the question of undue influence and that the court did not err in refusing to direct the verdict. It follows as well that the court properly refused to allow the motion for judgment notwithstanding the verdict.

Appellants earnestly contend that the verdict in this case is contrary to the manifest weight of the evidence, pointing out that only five witnesses testified for the plaintiff on the question of unsoundness of mind whereas thirteen witnesses gave as their opinion that the testator was of sound mind and memory at about the time the will and codicil were executed. As is usually the case, the testimony of these witnesses is in irreconcilable conflict, but the mere fact that numbers preponderate in favor of appellants does not mean that the evidence as a whole is in their favor. The jury and the trial judge saw the witnesses and heard their testimony. The jury had the right and doubtless did take into consideration the interest or lack of interest of the witnesses, their demeanor while testifying and all of the other factors determining the weight and

credibility to be given the testimony. Of the thirteen witnesses who expressed an opinion that James was of sound mind, three were the persons who witnessed the will itself and two were the father and mother of Doit Biggs, named as successor executor. Several others had been invited to the Spear home by Martha Spear at a time when the evidence shows she appeared anxious to establish that her brother was sound mentally. The two doctors who testified for the appellants on this issue expressed opinions as lay witnesses only, and both had very limited contacts with the testator. One of these did not testify positively that James was of sound mind but stated only that he did not observe anything unusual about his behavior on the occasions upon which he saw him in 1950. The five witnesses who expressed an opinion to the contrary for the plaintiff were all disinterested so far as appears from the evidence and their testimony was quite positive. We are unable to see that the verdict is palpably against the weight of the evidence. The verdict of a jury in a case contesting a will under the statute has the same force and effect as is given a verdict in a case at law under a like state of facts. When not manifestly against the weight of the evidence, the court is bound by it in the same manner and to the same extent as though it were a case at law, and this court will not reverse the judgment of the trial court where the evidence of the successful party, considered by itself, is clearly sufficient to sustain the verdict. (*Gum* v. *Reep,* 275 Ill. 503; *Keyes* v. *Kimmel,* 186 Ill. 109; *Calvert* v. *Carpenter,* 96 Ill. 63.) What has just been said about the weight of the testimony on the issue of testamentary capacity applies also to the issue of undue influence, with the further observation that we find little in the evidence adduced by appellants tending to rebut the presumption of undue influence arising from the facts and circumstances heretofore related. Where such a presumption exists, the burden is upon the persons against whom it operates to show that the

will was the free and voluntary act of the testator, and this rule is not inconsistent with the rule that the burden of proof, upon the whole case, is upon the contestant. (*Leonard* v. *Burtle,* 226 Ill. 422.) We find that the verdict of the jury upon both issues is not palpably against the weight of the evidence.

Error has been assigned upon the refusal of the trial court to admit into evidence a docket sheet of the circuit court of Clark County showing the judge's minutes made during the trial of the conservatorship case in that court, including the judge's entry made on November 15, 1949, showing that petitioner is not entitled to maintain her case and that petition is dismissed. Appellants rely on *Holliday* v. *Shepherd,* 269 Ill. 429, to sustain their position that it was error to refuse to admit this evidence, but that case does not support their position. In that case the properly certified record of the appointment of a conservator was received in evidence in a will contest case. This court held that it was properly received not as conclusive of the issue but to be considered along with all the other evidence in the case which showed among other things that testator had always been feeble-minded. The docket sheet offered here is not a certified copy of the record of any court showing an order of the court or any judicial findings. The minutes or memoranda which the judge makes on his own docket are merely kept by him for his own convenience to enable him to see that the clerk properly prepares the record. These do not constitute a record of the proceedings of the court. (*Gurnea* v. *Seeley,* 66 Ill. 500; *McCormick* v. *Wheeler, Mellick & Co.* 36 Ill. 114.) Whether or not a proper record of the circuit court of Clark County would have been competent we are not required to decide, because it was not offered. Moreover the fact that Katie Mitchell lost her suit to have a conservator appointed for her father was otherwise brought to the jury's attention. The conservatorship proceedings were referred to upon many occa-

sions in the testimony in the court below, being identified by the various witnesses as the "first trial" and the "second trial." One of plaintiff's own witnesses, Mary Simpson, stated that the conservatorship had been reversed in the circuit court on November 14, 15 and 16. Thus the jury was fully aware of what happened in the conservatorship proceedings and had the benefit of that information for what it was worth. We believe that if any error had been made in refusing the docket sheet it would have been harmless in view of the other evidence in the case.

Objection was made by appellants to the testimony given by plaintiff's opinion witnesses on the ground that a proper foundation for the opinion had not been laid and that their observation of the testator was too remote in point of time. As we have said, plaintiff's opinion witnesses had known testator for a long period of time and, considering their testimony collectively, their last contacts with him cover a period extending from late in the year 1948 to within three days of the execution of the will on October 11, 1949. Proof of the mental condition of the testator a reasonable time before or after the execution of the will is competent and will be received when it will tend to show mental condition at the time of the execution of the will. (*Milne* v. *McFadden,* 385 Ill. 11.) This court has held that proof of the mental condition of the testator two years before the execution of a will was properly received. (*Voodry* v. *University of Illinois,* 251 Ill. 48.) Moreover, we have examined the record carefully and find that plaintiff's witnesses stated sufficient facts on which to base an opinion. Many of appellants' opinion witnesses had had more limited contacts with testator than had plaintiff's witnesses. We believe there was no error in receiving the opinions of the lay witnesses in this case. The jury was properly instructed that it should give little weight to the testimony of such witnesses unless the witnesses had detailed conversations, incidents, facts or circumstances which

would induce a reasonable belief of testator's soundness or unsoundness of mind and that such an opinion could not be based upon guess or speculation.

Martha Spear offered to testify as a witness for the defendants, E. B. Van Scoyk, the Presbyterian Church of Mattoon and Edmund Ramey. The court held that she was not a competent witness for any of the defendants under section 2 of the Evidence Act. (Ill. Rev. Stat. 1951, chap. 51, par. 2.) Under the provisions of this statute none of the defendants was a competent witness to testify in his own behalf as to transactions with the testator prior to his death. "It would be a violation of both the letter and spirit of the statute to hold that notwithstanding their incompetency as witnesses in their own behalf each was competent to testify for the other." (*Linn* v. *Linn,* 261 Ill. 606, 615.) The ruling of the trial court was correct.

Objection is made to the admission of the testimony of one Ezra Riggins who testified for plaintiff concerning the performance of Katie Mitchell of certain services for her father, including the washing of his clothes. The reasons assigned are that such testimony is liable to excite sympathy and prejudice in the minds of the jurors. We believe that this evidence was competent, particularly upon the issue of undue influence. It tended to show a friendly and close relationship between Mrs. Mitchell and her father up to that period of time in 1949 when he was confined to the home of Martha Spear because of feebleness and illness. But more than this, an issue upon this question is specifically tendered by the pleadings. Paragraph 13 of the complaint alleges that when James had all of his faculties and before he came under the influence of Martha Spear he and plaintiff were on friendly terms and that she had performed services for him for many years. These allegations are specifically denied by paragraph 13 of the answer. The issue having been made, proof to sustain the allegation was competent. If appellants felt that proof of the perform-

178

ance of services was incompetent, that question should have been raised by motion to strike these allegations from the complaint.

Objections have been made to the giving and refusal of certain instructions but the abstract of record does not set forth all of the instructions. Only those to which objection is made are abstracted. We are, therefore, not required to consider any of the objections to instructions. *People v. Wetherington,* 348 Ill. 310; *Reavely v. Harris,* 239 Ill. 526.

We find no error in the proceedings in the trial court and its decree will, therefore, be affirmed.

*Decree affirmed.*