*In re* ESTATE OF MARY T. DOSSETT, a/k/a Mayme Dossett, Deceased (Phoebe Graff, Petitioner-Appellant, v. James Bennet, Indiv. and as Ex'r of the Estate of Decedent, *et al.*, Respondents-Appellees).

Third District   No. 3—86—0629

Opinion filed August 24, 1987.

Timothy V. Johnson, of Johnson, Frank, Frederick & Walsh, of Urbana (Glenn Muller, of counsel), for appellant.

Heyl, Royster, Voelker & Allen, of Peoria (Bradford B. Ingram, of counsel), for appellees.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Petitioner Phoebe Graff appeals from judgment of the circuit court of Tazewell County granting respondents' motion for a directed verdict at the close of petitioner's case in chief and dismissing her complaint. For reasons that follow, we reverse.

Mary T. (Mayme) Dossett, a widow, died on September 27, 1982, at age 84. A will dated March 1, 1982, was admitted to probate on October 29. Petitioner is the sister of the testatrix and her only heir at law. In the March 1982 will, petitioner was expressly disinherited "not through any lack of affection, but rather [because testatrix did] not wish her to share in [testatrix'] estate." The will bequeathed $1,000 to respondent William Bennet and the remainder of the estate to respondent James Bennet, who was also nominated executor.

On March 8, 1983, petitioner filed a complaint to set aside the will on grounds of undue influence and lack of testamentary capacity. The matter proceeded to a jury trial on July 15-16, 1986. Petitioner's evidence established that testatrix resided at the Hopedale Nursing Home from 1979 until her death. She was paralyzed below the waist,

and her health during that time was generally poor and deteriorating. Respondents knew testatrix, a retired school teacher, from their childhood. Together, they had farmed testatrix' land since around 1961. In 1980 testatrix gave respondents a power of attorney allowing them to transact business for her. The document was prepared by respondents' attorney, who also witnessed its execution by testatrix.

In April 1981, another sister, Ruth Davis, died intestate. Petitioner's grandson, Dennis Graff, was selected as the attorney for the Davis estate. Because of the deteriorating health of both Phoebe and Mayme, Dennis suggested that the two surviving sisters jointly disclaim their interests in the Davis estate, thereby avoiding certain inheritance and estate taxes. The sisters agreed to the joint disclaimer, and on August 30, 1981, they executed a joint disclaimer document which was prepared and witnessed by Dennis Graff. After the document was filed, Dennis returned to visit testatrix, and he encountered respondent James Bennet. According to Dennis, James inquired about the joint disclaimer. James stated that that he had testatrix' power of attorney and he was upset about the fact that she had signed the document outside his presence. Dennis testified that James then said that he intended to talk with testatrix about revoking the disclaimer because he (James) did not think she should be giving her property away during her lifetime.

It appears that subsequent to this conversation, testatrix executed a will drafted by Dennis Graff in which she nominated her nephew, Harold Graff, as executor and bequeathed her entire estate to petitioner Phoebe Graff. This will was signed and witnessed on October 10, 1981. According to Dennis, testatrix expressed her satisfaction with the will as drafted because it kept the family farm in the family. Dennis further testified that testatrix had complained to him that Jim Bennet was pressuring her to sign another will and that she had no intention of doing so. Finally, Dennis testified that both respondents had acted nervous around him when he (Dennis) encountered them during a visit with testatrix around April of 1982.

The evidence further established that the will executed on March 1, 1982, was prepared by respondents' attorney at no charge to testatrix. At trial, both respondents denied having any knowledge of that will until after testatrix' death. However, a "renunciation" document was procured by James Bennet through his attorney purporting to revoke testatrix' disclaimer of interest in the Davis estate. It does not appear that the renunciation document, executed on March 18, 1982, was ever filed in the Davis estate.

A nurse from Hopedale Nursing Home who had attended the tes-

tatrix around the period when she signed the March 1, 1982, will testified that, according to her notes, testatrix was confused and disoriented to place on February 25, 1982. Other evidence indicated that testatrix was depressed and had expressed her desire to die in April 1982.

According to petitioner's witnesses, testatrix had maintained a loving relationship with petitioner over the years. Respondents, however, testifying under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102), said that testatrix' relationship with her sister "cooled" after testatrix moved into the nursing home. James Bennet testified that petitioner's witnesses were not being truthful in their testimony of the sisters' mutual affection for each other. James also explained that the renunciation document had been procured by him in response to testatrix' complaint to him that she had been signing too many papers and that she feared she had "signed her land away."

According to respondents, testatrix was progressively deteriorating physically during the period that she resided in the nursing home, and was sometimes "down in the dumps," but that she always remained mentally sharp. Both respondents denied having personally paid for the preparation of the March 1, 1982, will.

At the close of petitioner's case in chief, respondents moved for a directed verdict. After receiving arguments of counsel, the court explained in extensive detail its decision in favor or respondents, pertinent parts of which follow:

> "Now, we have evidence here that Mrs. Dossett, contemporaneously with March of 1982 and for some time prior thereto was physically disabled ***. We have had some evidence that there might have been periods *** of disorientation, but we have also had evidence that she was alert, *** was depressed ***.
>
> That doesn't mean that she doesn't have a sound mind and memory. And there's nothing here to show, *** either directly or circumstantially that on this particular date at the time this will was executed that somehow she didn't know what she was doing.
>
> And the one witness that we heard from really wasn't asked many questions about that matter.
>
> As to the matter *** of the allegations that the will was procured at the time when the person lacked testamentary capacity, *** I do not believe that we can say from this evidence that certainly it's more probably true than not true that she

lacked testamentary capacity. I deem as a matter of law that that decision cannot be made.

And, therefore, on the ground alleged that Mary Thorne Dossett or Mayme Dossett lacked testamentary capacity on March 1, 1982 to make a will, the Court would simply hold and direct that in effect she did have testamentary capacity.

This raises the matter of undue influence. Now, one witness, a grandson of the contestant here, has *** testified that the testatrix *** told him that the respondents here were trying to get her to leave them her property. We have that. No one else. And we also have evidence here that for some time prior to March 1, 1982 these two respondents were, let's face it, looking after Mayme Dossett, looking after her property, tending to her business. Legally they were doing that because of powers of attorney that were granted them by Mayme Dossett.

* * *

[T]hey occupy with respect to her a special position of confidence or trust. I think we can even refer to it as a fiduciary relationship. If you are more or less physically helpless and you can no longer get out and about and you give someone a power of attorney which gives them power to *** collect your monies and write your checks and go into your lock box, no question you are reposing special confidence and trust in them.

* * *

And I deem to be the law that if there exists a fiduciary relationship and then something occurs that benefits the fiduciary, the law raises certain presumptions which those people have to rebut.

* * *

They are now placed in a position where they could have exercised undue influence. The law also requires that the evidence show that *** the Bennets *** received a substantial benefit under the terms of the document. Well, that certainly has been proved; hasn't it. I mean, one of them gets $1000 and the other one gets the rest of the estate and is named the executor ***. You've got two things established.

But with respect to a will in order to raise this presumption there has to be another factor. With respect to a will that is challenged, the evidence must show that either those Respondents prepared the will, which clearly here the evidence shows that they did not, or that they caused it to be prepared. Now,

while there is some evidence here that with respect to a certain instrument, Exhibit Four, that was prepared by the Culbertsons, I think the Bennets brought that to their attention. But as far as the will, that was prepared by Mr. Culbertson, who testified here. And I might add, *** the powers of attorney, remember, a few years before were prepared by his father. With respect to the will, his going to see her, getting it prepared, as far as the attestation and the mechanics of that, there is nothing here to show that these fiduciaries here were the ones that either prepared it or caused it to be prepared.

And sometimes when you're sizing up the evidence and ruling on a motion for a directed verdict you consider the evidence that has been presented, you also consider the evidence that hasn't been presented. I was somewhat surprised during the course of the trial at the relatively brief examination of Mr. Culbertson, virtually no examination whatever concerning the actual mechanics or *** the attestation of this instrument by the testatrix and Mr. Culbertson and the other two witnesses on March 1 of 1982.

And I just can't *** infer from the lack of the evidence that certain conditions existed. And because here there is no evidence, at least no convincing evidence to the Court that the instrument was prepared by these Respondents or that these Respondents caused it to be prepared, I cannot then bring into play the presumption of the exercise of undue influence by people who were fiduciaries.

Now, I have already indicated to you that there is no evidence from which I can *** find or *** infer, nor could you, the lack of testamentary capacity.

* * *

But as to her mental capacity on March 1, and as far as the instrument was concerned, there is nothing to show that the Respondents here caused that or procured it to be made.

Now, in Illinois now when we deal with directed verdicts our courts of appeal *** and *** the supreme court of this state in what is called the *Pedrick* case has held that when a court passes on a motion for directed verdict it grants that motion if the evidence so strongly favors movant that no contrary verdict or finding could be made. And as a corollary of that, you could say if the lack of evidence so strongly favors the movant that no contrary verdict could stand, then the motion should be granted.

I want to make it clear here that in granting this motion I am not substituting for your judgment my assessment of the believability of witnesses. Always in dealing with motions on directed verdicts, at least certainly this one, *** I cannot do that. I'm simply saying on the evidence presented here I could not let you people decide the question of mental capacity. And on the matter of *** undue influence, the presumption of undue influence as a result of the fiduciary relationship has not been established."

■■ Under the *Pedrick* standard, a court should direct a verdict or enter judgment *n.o.v.* only where all of the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence would ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) It is incumbent upon the trial court to apply this standard (*Sandburg-Schiller v. Rosello* (1983), 119 Ill. App. 3d 318, 456 N.E.2d 192), and failure to do so may be cause for a reversal on review. Petitioner correctly notes that the trial court's misquotation of the *Pedrick* test here represents a relaxed standard.

We have reviewed the evidence of record in the light most favorable to the plaintiff to determine whether the trial court's ruling in this case was error.

■■ ■ To set aside a will on the ground of lack of testamentary capacity, the will contestant must establish that at the time the will was executed the testator lacked sufficient mental ability to know and remember who were the natural objects of her bounty, to comprehend the kind and character of her property, and to make disposition of her property according to some plan formed in her mind. (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 369 N.E.2d 1320, 1328.) Where, however, the evidence does not suffice to prove lack of testamentary capacity, a will contestant may nevertheless succeed in having the will set aside under certain conditions where evidence of testatrix' reduced mental faculties is combined with proof of overreaching to the extent that the will does not represent the true wishes of its maker. To prove undue influence, the contestant must establish influence exerted in connection with the execution of a will in which the dispository provisions are more than the will of the influencer than the testatrix. *Beyers v. Bilingsley* (1977), 54 Ill. App. 3d 427, 369 N.E.2d at 1327.

■ The trial court, it appears, placed undue emphasis on the fact that petitioner did not put on evidence that testatrix here was disoriented, confused or deeply depressed on the precise date that the will

was executed. "It is well established that proof of the mental condition of the testat[rix] a reasonable time either before or after the execution of the will is competent *** to show mental condition at the time of making the will." (*Trojcak v. Hafliger* (1972), 7 Ill. App. 3d 495, 288 N.E.2d 82, 85, citing *Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 160, 115 N.E.2d 226.) There was evidence in this case that showed that on February 25, 1982, testatrix suffered from diminished mental capacity. And around March 5, when Dennis Graff visited testatrix, he testified that "[s]he was very weak. She was confused." Other testimony slightly more remote from the date of the will in question corroborated the fact that testatrix suffered from some diminution of mental faculties. The testimony did not indicate that testatrix had lucid moments during the period in question. Rather, the testimony consistently demonstrated that her condition was deteriorating in a progressive manner. A substantial amount of testimony was presented to show the close and affectionate relationship between testatrix and petitioner. Testimony was introduced to show that testatrix wanted her sister to be the beneficiary of her estate and to keep her real estate within the family. In our opinion, petitioner's evidence of lack of testamentary capacity on specific dates surrounding March 1, 1982, together with other evidence indicating that the will's property disposition might not have represented testatrix' testamentary intentions, was adequate to survive respondents' motion for a directed verdict when tested by the *Pedrick* standard.

   ■ On the issue of undue influence, the trial court found a fiduciary relationship and that respondents stood to benefit from the March 1982 will. The only element that the court found lacking was respondents' preparation or procurement of the will. In so ruling, the court sifted through the evidence, weighed it and invaded the province of the jury. Petitioner established that it was respondents' attorney who drafted the will at contest even though testatrix had, only a few months earlier, asked her great nephew, Dennis Graff, to do certain legal work in connection with her estate. The fact that respondents' attorney made no charge to testatrix for his work and that both respondents denied having paid for the will personally was a matter that the jury was entitled to consider in weighing the testimony bearing on undue influence. Similarly, the jury was entitled to consider the fact that respondents both denied having any knowledge of the will at contest even though, as holders of testatrix' power of attorney, they had access to the lock box where it was found.

   Moreover, respondents admitted procuring the renunciation document, also drafted by their attorney, which was executed less than

three weeks after the will in question was signed. According to Dennis Graff, testatrix had complained of pressure by respondents to change her will. Graff also testified that James Bennet had expressed his personal dissatisfaction with Graff's business association with the testatrix.

In our opinion, the evidence of respondents' direct and indirect participation in testatrix' estate plans was sufficient to permit the inference that respondents were instrumental in procuring the will at contest.

■ In summary, applying the proper *Pedrick* standard to the evidence of record, we find that, while admittedly petitioner's evidence of undue influence and lack of testamentary capacity was not overwhelming, the existence of factual disputes, questions of witness credibility, and the need to resolve conflicts in the evidence and to draw inferences therefrom compel the conclusion that a verdict should not have been directed here. We remand this cause to the circuit court of Tazewell County for a new trial.

Reversed and remanded.

STOUDER and HEIPLE, JJ., concur.