In re ESTATE OF WILLIAM ROESELER, Deceased (Mary Anderson, Petitioner-Appellant, v. Barbara Kubitz, as Ex'r of the Estate of William Roeseler, Deceased, et al., Respondents-Appellees).

First District (3rd Division) No. 1—94—3018

Opinion filed March 19, 1997.—Rehearing denied April 18, 1997.

1004

Ryan & Nelson, of Arlington Heights (James T. Ryan, of counsel), for appellant.

Spina, McGuire & Okal, P.C., of Elmwood Park (Timothy H. Okal, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

The decedent, William Roeseler, died on August 4, 1990, and his last will and testament, executed on May 23, 1990, was admitted to probate on August 31, 1990. Thereafter, the petitioner, Mary Anderson, the decedent's stepdaughter, filed two pleadings regarding that will against respondents Scott, Walter, and Maxine Christopher; Barbara Kubitz; and Bernice Chadwick. The first pleading was a two-count petition to contest the will, alleging at count I that the decedent's physical and mental condition had deteriorated significantly by the time he executed his will and that he therefore lacked testamentary capacity, and at count II that the decedent had become dependent upon respondents for his basic needs and that they exerted undue influence upon him in order to cause him to name them as beneficiaries in his will. The second pleading filed by petitioner in this action was an independent but related complaint against respondents seeking compensatory and punitive damages for their alleged intentional interference with petitioner's economic expectancy under the decedent's will.

Respondents filed a motion for summary judgment as to plaintiffs' will contest petition, which the trial court granted. Petitioner then filed a motion to reconsider that order which the trial court denied. Thereafter, respondents filed a motion to dismiss petitioner's intentional interference complaint, on the grounds that the wrongful conduct alleged therein was identical to the conduct alleged in plaintiff's will contest action which had been defeated on summary judgment. The trial court granted that motion to dismiss, and petitioner now appeals from those orders.

The undisputed facts are as follows. The petitioner was the only child of Fern Roeseler and Fern's first husband, who died in 1967. The decedent became the stepfather of the petitioner by virtue of his

marriage to Fern in 1968. Fern and the decedent lived in Chicago, and the petitioner lived in California, where she had moved with her husband in 1955. The petitioner visited the Roeselers in Chicago annually, until 1983 when she suffered a stroke and could no longer make the trip. Shortly after their marriage, in 1968, Fern and the decedent executed reciprocal wills leaving everything to each other except that the petitioner would inherit upon the death of the last remaining spouse. Fern died in 1983, and in 1984, the decedent executed a will leaving everything to the petitioner and to the petitioner's daughter, Jean Anderson. The 1968 and 1984 wills were drafted by the Roeselers' attorney and neighbor, Walter Christopher. On July 25, 1989, the decedent executed a new will prepared by Walter's son, Scott Christopher, who became the attorney for the decedent after Walter suffered a stroke. That will designated as beneficiaries decedent's neighbors, respondents Maxine Christopher, who was the mother of Scott and the wife of Walter; Barbara Kubitz; and Bernice Chadwick. It did not leave anything to the petitioner. Barbara Kubitz had previously been given written power of attorney by the decedent in 1988 pursuant to an instrument drafted by Scott Christopher.

It is further undisputed that in 1990, Scott Christopher contacted Kurt Heerwagen, a partner in the law firm of Boeger, Heerwagen, Lusthoff and Brendemuhl, to request that Heerwagen redraft the decedent's July 1989 will. Scott Christopher then sent to Heerwagen a copy of the decedent's 1989 will and a letter containing instructions outlining the new will. Scott later disposed of his file copy of that letter and no copy thereof was ever produced in court. Kurt Heerwagen prepared a will, which the decedent signed on May 23, 1990. The terms of the 1990 will were identical to those of the July 25, 1989, will prepared by Scott Christopher, except that the new will expressly provided that if Maxine Christopher predeceased the decedent, then her descendants, including Scott Christopher, would inherit from the decedent in her stead.

In support of their motion for summary judgment, respondents relied upon the deposition testimony of the petitioner, Mary Anderson; Craig Lusthoff, a partner of Heerwagen and a witness to the signing of the decedent's will; Maxine Christopher; Barbara Kubitz; and Bernice Chadwick. Both respondents and petitioner relied upon the deposition testimony of Kurt Heerwagen; Scott Christopher; and Blanche Wardell, the decedent's sister-in-law. In addition, the petitioner submitted certain Oak Park Hospital records relating to the decedent's health.

In the excerpts of the deposition testimony of the petitioner, Mary Anderson, submitted by the respondents in support of their

summary judgment motion, petitioner testified that she had moved with her husband to California in 1955 because he had obtained a job there and that her natural parents lived in Chicago at all times while she lived in California. Petitioner testified that she came to Chicago for her natural father's funeral in 1967, but that when her mother had a mild stroke shortly thereafter, she did not come to Chicago to visit her in the hospital, alleging that her mother did not wish her to do so. She also stated that after her mother was cremated, she did not inquire as to the disposition of the ashes and had no idea as to what had happened to them. Petitioner also said that her belief that there was undue influence exerted upon the decedent was based on the fact that he changed his will in 1989. Petitioner further stated that the reason she believed that Bernice Chadwick and Barbara Kubitz took advantage of their relationship with her stepfather was that they were named in his will at a time when he depended upon them for his basic needs.

Craig Lusthoff testified in his deposition that he was a law partner of attorney Heerwagen and that he was a witness at the signing of the decedent's May 1990 will. According to Lusthoff, the decedent lived in an "interesting older home" that "was nicely done." Lusthoff also testified that during conversations with the decedent, he observed that the decedent spoke "plainly and clearly."

Maxine Christopher testified in her deposition that her husband, Walter, suffered a stroke in January 1987 and as a result lost his ability to communicate clearly and never thereafter returned to the practice of law. Maxine also stated that she had never assisted in her husband's or in her son Scott's law practices. Maxine testified that she did not know that she was a beneficiary under the decedent's May 1990 will until approximately three days prior to his death.

Barbara Kubitz testified in her deposition that she had no knowledge of the contents of the decedent's will until after his death and that she was not aware until that time that she was the executor thereunder or of the extent of his estate. Further, Kubitz had neither met nor heard of the attorney who drafted the decedent's May 1990 will, Kurt Heerwagen. Kubitz also stated that she visited the decedent on most holidays and every Sunday, and that she took the decedent grocery shopping, to the doctor and to pick up his prescriptions after he lost his driver's license. Kubitz further stated that she had been given power of attorney over the legal and financial affairs of the decedent in 1988.

Bernice Chadwick testified at her deposition that she was the decedent's next-door neighbor, that she did not know about his will until after his death, and that she did not know the attorney who

drafted that will. Chadwick did not have a social relationship with the Christophers, had little association with them, and did not know of Walter Christopher's 1987 stroke until sometime in 1991.

As noted, both parties relied upon excerpts of the deposition testimony of Scott Christopher, Kurt Heerwagen, and Blanche Wardell. Both submitted their own excerpts from these depositions. The deposition testimony of Scott Christopher to which respondents referred revealed that Scott had prepared a will for the decedent in 1989, but that he never possessed a copy of the May 1990 will, nor did he ever have any knowledge as to its preparation or contents until after the death of the decedent. In that regard, Scott stated that when Barbara Kubitz inquired about the will, he told her to talk to Heerwagen because he knew nothing about it. While serving the decedent as his attorney, Scott also prepared the decedent's tax returns. He said that in so doing he had merely acted as a tax preparer and had referred any complicated tax analysis to an accountant.

In the portions of the deposition testimony of Scott Christopher to which petitioner referred, Scott stated that he had practiced law as a partner of Walter Christopher, his father, until 1987, when Walter had a stroke, after which Scott represented the decedent. Scott testified that he advised the decedent that he felt "uncomfortable" drafting the decedent's 1989 will because the decedent wanted to name Scott's mother, Maxine, as a beneficiary therein. Scott nevertheless drafted that will. Scott advised the decedent that another attorney would be needed to draft a subsequent will, in which he (Scott) would be named to inherit in Maxine's stead if she were to predecease the decedent. While discussing with the decedent who should draft a new will, the decedent commented to Scott that the petitioner would probably wish to contest such a will because she would not be left anything therein. Scott then contacted Kurt Heerwagen regarding the preparation of the new will. Heerwagen's partner, Craig Lusthoff, had gone to high school with Scott and was also Scott's college fraternity brother. Heerwagen had also gone to the same college, and Scott had previously referred other business to Heerwagen's law firm in the past.

According to Scott, he sent to Heerwagen a copy of the July 25, 1989, will which he had prepared for the decedent, enclosing a cover letter that outlined what the decedent wished the terms of the new will to be. Scott recalled that he had two telephone conversations with Heerwagen after sending that correspondence. In the first of those conversations, Heerwagen advised Scott to destroy his copy of the aforementioned cover letter that Scott had sent to Heerwagen

because it might impact any subsequent will contest, but Scott refused to do so. In the second conversation, Heerwagen informed Scott that the May 23, 1990, will had been executed. Scott further testified that he had since discarded the letter in question, not because Heerwagen advised him to do so, but because he was not the attorney who had drafted the May 1990 will and had no corresponding file in which to place the letter.

In the excerpts of the deposition testimony of Kurt Heerwagen to which respondents referred in their motion, Heerwagen stated that the only contact Scott Christopher had had with him regarding the decedent's May 1990 will was to refer the matter to him for further consultation with the decedent. Heerwagen subsequently received a telephone call from the decedent directly. During that conversation, the decedent informed him that he did not want "the state" to get his property. He then advised Heerwagen as to the size of his estate and also as to the manner in which he wanted his property to be distributed. Heerwagen concluded that the decedent seemed to be "fairly certain" of what he wanted to do with his will.

According to Heerwagen, following his conversation with the decedent, he independently prepared the will, without the participation of Scott Christopher, and then mailed a copy thereof to the decedent only on April 10, 1990. Thereafter, Heerwagen had a second telephone conversation with the decedent, during which the decedent approved of the draft of the will and scheduled a time for its signing. The signing took place one month later, on May 25, 1990, at the home of the decedent. According to Heerwagen, none of the respondents were present at the signing of the May 1990 will, nor did they have any knowledge that it had been prepared or scheduled for signing. Heerwagen also stated that, at the signing, the decedent was alert and responsive and was clear as to his intentions regarding the disposition of his property. Heerwagen stated that he never met or discussed the will with any of the respondents prior to the death of the decedent. The original will was kept at all times at Heerwagen's office, pursuant to decedent's instructions, and was filed by Heerwagen, who had originally appeared before the probate court as the attorney for the estate of the decedent.

The portion of the Heerwagen deposition testimony to which petitioner referred in her response reflects that Heerwagen did not know that the decedent had been married, much less that he had a stepdaughter from his marriage, when he drafted the May 1990 will. Heerwagen testified that he therefore did not know anything about the relationship between the decedent and the petitioner at the time he drafted that will. Heerwagen further stated that he spent only 15 minutes with the decedent when the will was signed.

The portions of the deposition testimony of Blanche Wardell upon which respondents relied reflected that she had lived in Florida since 1962 and that she was the decedent's sister-in-law, having married Fern Roeseler's brother. Wardell testified that she had been close to the decedent for 27 years and that she had had social contact with him and his wife on numerous occasions. Wardell characterized the decedent as being a very private person who considered himself to be self-reliant and who did not want anybody interfering with him in any way. She also testified that in the five years before his death, the decedent never had anyone stay with him to take care of him, such as a nurse or a housekeeper. The decedent cooked his own food, largely consisting of TV dinners and cans of stew. Wardell said that, as far as she knew, he was in control of his bladder and that his only physical problem which made him dependent upon others was his failing eyesight. Wardell said that the decedent lived in financial comfort and that he was still doing his own banking in 1987. Wardell pointed out that she was in Europe when he signed the 1990 will and that she had last seen the decedent more than three years prior to the signing of that will. Wardell additionally stated that she had "absolutely no idea" about any specific instances in which respondents did anything actively to gain control or dominance over the decedent. Wardell also testified that she did not have any facts to support her feeling that the decedent did not have the ability to know the nature and extent of his property when he signed his July 25, 1989, will. Wardell further stated that she had no facts to show that the decedent did not know to whom he wanted to leave his property in 1989 and that she did not know whether he knew he was in fact signing a will at that time.

In the portions of Wardell's deposition testimony upon which the petitioner relied, Wardell testified that the decedent repeatedly told her throughout the years that he was glad to have the petitioner as family and that he was happy in that regard to have family to whom he could leave his money. Wardell further stated that the decedent and the petitioner were friends who laughed and joked together, that the decedent told her that the petitioner called him "dad," and that the decedent adored the petitioner's daughter. After the death of the decedent's wife in 1983, Wardell visited the decedent several times and otherwise communicated with him by letter or telephone at least twice each month, including several conversations with him shortly before his death. Wardell first noticed that the decedent had begun to fail mentally and physically during her stay at his home in 1985. She noticed at that time that his mind wavered, that he had "failed tremendously from the man I had known a long time ago," that he

was not able to care for himself, and that he needed somebody to stay with him. Wardell further testified that she stayed with Roeseler again for a period of three weeks in 1987. During that visit, she noticed that Roeseler, who had once been a very "dapper" man, was wearing filthy clothes. She also stated that he and his house were filthy and that his "sweaters were dirty, *** the sleeves were literally black[,] *** the sheets on his bed *** were indescribable *** [and that] he wore underwear which was absolutely brown, real brown." According to Wardell, by 1987, the decedent "was no longer up to par[,] *** had begun to decline in his ability to prioritize values[,] *** [and] didn't know what was important to him and what was not."

The petitioner also referred to Wardell's testimony that, between 1988 and his death, the decedent had become a very proud old man who was trying to retain his dignity. She testified that he had reached the point where he repeated himself constantly, stubbornly insisted on staying in his house and resisted the attempts of people trying to help him. Wardell also stated that, by May 1990, the decedent had become more enfeebled, was not in full control of his own thinking or capable of sorting out ideas in his head or of making any sound judgment. She testified:

"I have facts that he had become extremely senile, very slow in speech *** [and] his reactions were very slow. *** [H]e was not mentally alert[,] *** was filthy *** [and] was not eating regularly."

According to Wardell, the decedent was almost blind and suffered from other various physical ailments, had difficulty writing checks and signing his name, and was not able to adequately care for himself or make rational decisions. She testified that, at that time, the decedent merely rambled in conversation and was "very mentally slowed down." Wardell had several conversations with the decedent in and around May 1990 in which she observed that the tone of voice and manner of speaking of the decedent were slow and enfeebled. Wardell also received a letter from the decedent in June 1990 in barely legible handwriting. She stated that the letter was not lucid, although she did not fully recall its contents. Wardell concluded that by May 23, 1990, the decedent was "senile and not competent," and that he "definitely was not" capable of making a will.

Finally, the petitioner referred to Wardell's deposition wherein she testified that, notwithstanding that she, the petitioner Mary Anderson and Mary Anderson's daughter were the decedent's only living family, respondents failed to inform them that the petitioner had been taken to the hospital immediately before his death and failed to inform them that he had died until a week afterwards. According to Wardell, this was further proof of the fraudulent intentions of the respondents.

In addition, the petitioner submitted records from Oak Park Hospital which reflect that, at the time of his death, Roeseler suffered from cataracts, hearing loss, emphysema, high blood pressure and fluid retention.

The trial court granted respondents' motion for summary judgment on both counts of the will contest petition, including count I, alleging a lack of testamentary capacity, and count II, alleging undue influence. Petitioner filed a motion to reconsider that order. In support of that motion, petitioner submitted the affidavit of Dr. Sanford Finkel, a licensed psychiatrist in Illinois. In his affidavit, Finkel averred that decedent had become increasingly weak and susceptible to undue influence in his affairs; that he desired to continue living at home and was misled by respondents into believing that the petitioner wished to remove him from his home; and that respondents substituted their judgment for that of the decedent in the drafting of his May 1990 will.

The trial court denied petitioner's motion to reconsider. Respondents thereupon filed a section 2—619 motion to dismiss (735 ILCS 5/2—619 (West 1994)) petitioner's amended complaint for intentional interference with petitioner's economic expectancy to inherit from the decedent. In their motion, respondents urged that because the trial court had entered summary judgment against the petitioner on her will contest petition, the petitioner could not prevail on her intentional interference claim because it was based on identical allegations of tortious conduct. The trial court granted the respondents' motion to dismiss. The petitioner appealed from both the summary judgment order and from the order dismissing the intentional interference complaint.

DISCUSSION

On appeal, the petitioner contends that the trial court erred in granting respondents' motion for summary judgment. She urges that there are genuine issues of material fact as to whether the decedent had adequate testamentary capacity to create his May 1990 will and as to whether respondents exercised undue influence over the decedent in connection with the signing of that will. Petitioner further contends that, since the trial court erred in granting summary judgment as to her will contest petition, it also erred in dismissing her tortious interference with economic expectancy complaint. For the reasons discussed more fully below, we reverse both the grant of summary judgment on the will contest petition and the dismissal of the intentional interference tort action.

■ It is well established that a motion for summary judgment

may properly be granted when "the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1994); *e.g., Torres v. City of Chicago,* 261 Ill. App. 3d 499, 632 N.E.2d 54 (1994). In ruling on a motion for summary judgment, the trial court must construe the pleadings, depositions and affidavits in the light most favorable to the nonmoving party. *E.g., First State Insurance Co. v. Montgomery Ward & Co.,* 267 Ill. App. 3d 851, 642 N.E.2d 715 (1994); *Stephen v. Swiatkowski,* 263 Ill. App. 3d 694, 635 N.E.2d 997 (1994). Moreover, if fair-minded persons could draw different inferences from the undisputed facts, summary judgment should not be granted. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *Anglin v. Oros,* 257 Ill. App. 3d 213, 628 N.E.2d 873 (1994). Appellate review of an order granting summary judgment is *de novo. E.g., Hesselink v. R.L. Perlow Corp.,* 265 Ill. App. 3d 473, 637 N.E.2d 575 (1994); *La Salle National Bank v. Skidmore, Owings & Merrill,* 262 Ill. App. 3d 899, 635 N.E.2d 564 (1994); *Myers v. Health Specialists, S.C.,* 225 Ill. App. 3d 68, 587 N.E.2d 494 (1992).

 We first address petitioner's contention that an issue of fact exists as to whether the decedent lacked testamentary capacity to create the May 1990 will. To set aside a will on the grounds of lack of testamentary capacity, the petitioner must demonstrate that at the time the will was executed the testator lacked sufficient mental ability to know he was making a will, to know and remember the natural objects of his bounty, to comprehend the character and extent of his property and to make disposition of his property according to a plan formed in his own mind. *Butler v. O'Brien,* 8 Ill. 2d 203, 133 N.E.2d 274 (1956); *In re Estate of Ciesiolkiewicz,* 243 Ill. App. 3d 506, 611 N.E.2d 1278 (1993); *In re Estate of Dossett,* 159 Ill. App. 3d 466, 512 N.E.2d 807 (1987). Any legatee under a prior will has standing to contest the validity of a will if her contest is initiated within the prescribed statutory period and she stands to inherit if the contested will is set aside. See generally 755 ILCS 5/8—1 (West 1994); *In re Estate of Keener,* 167 Ill. App. 3d 270, 521 N.E.2d 232 (1988). The natural objects of a testator's bounty include those people related to him by ties of blood or affection, *i.e.,* those who are or should be considered to be the recipients of his bequests. See, *e.g.,* 79 Am. Jur. 2d *Wills* § 71, at 330 (1975); *Cunningham v. Stender,* 127 Colo. 293, 255 P.2d 977 (1953). It is well recognized that evidence of the mental condition of the testator within a reasonable time before or after the making of a will is relevant to show his mental condition at the time of the exe-

cution of the will. *Voodry v. Trustees of University of Illinois*, 251 Ill. 48, 95 N.E. 1034 (1911) (evidence of the mental condition of the testator two years prior to the execution of the will relevant to show lack of testamentary capacity at time of execution); *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278; *Dossett*, 159 Ill. App. 3d 466, 512 N.E.2d 807. The testator is presumed sane, and the burden of proof is on the will contestant to rebut that presumption. *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278.

■ In the instant case, the record can support a reasonable inference that William Roeseler lacked testamentary capacity at the time of the signing of the May 1990 will. In that regard, according to Blanche Wardell, the decedent's mental and physical condition began to deteriorate in as early as 1985. Wardell testified that she visited the decedent in 1985 and in 1987, and that she kept in touch with the decedent after 1987 by mail and by telephone, stating in particular that she had had several telephone conversations with the decedent in and around May and June 1990 and that she had received a letter from him at around that time. On the basis of her contact with the decedent, Wardell stated that the decedent, who had formerly kept himself clean and was mentally alert, began to live in filth and squalor and became unable to discern what was important to him or to prioritize his values. Wardell concluded from her firsthand observations that the decedent had become senile and incompetent, was incapable of making any sound judgment, merely rambled and repeated himself in conversation, was not in full control of his own thinking, and was otherwise physically dependent on respondents for his basic needs.

The record also supports an inference that the decedent was not aware of the natural objects of his bounty, insofar as for a period of 20 years, the petitioner, his stepdaughter, had been either the sole alternative beneficiary under the will of the decedent (when his wife was alive) or the primary beneficiary (after his wife's death). Furthermore, according to Wardell's testimony, the decedent considered the petitioner to be his family and was happy in that regard to have her as a devisee under his will. Wardell further stated that the decedent and the petitioner were friends who laughed and joked together, that according to the decedent the petitioner called him "dad," and that the decedent adored the petitioner's daughter. See 79 Am. Jur. 2d *Wills* § 71 (natural objects of bounty include those people related to testator by ties of blood or affection, *i.e.*, those who are or should be considered to be the recipients of his bequests); *Cunningham*, 127 Colo. 293, 255 P.2d 977. See also *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278 (summary judgment particularly inap-

propriate where the inferences sought to be drawn deal with questions of motive, intent or subjective feelings and reactions). The record also reflects that the decedent never even mentioned to attorney Heerwagen, who drafted the 1990 will, that he had a stepdaughter or that he had ever been married. These facts are sufficient to generate a reasonable inference that the decedent lacked sufficient mental ability to know and remember the natural objects of his bounty. The testimony of Wardell concerning the decedent's degeneration, her opinion as to his senility and incompetence, and her testimony regarding the natural objects of his bounty are sufficient to create an issue of fact as to the decedent's testamentary capacity during the period in question. *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278 (lack of testamentary capacity exists where testator lacks sufficient mental ability to know he is making a will, to know the natural objects of his bounty, to comprehend the character and extent of his property and to make disposition of his property according to a plan formed in his own mind); *Dossett*, 159 Ill. App. 3d 466, 512 N.E.2d 807.[1]

Respondents contend that the petitioner cannot rely on the deposition testimony of Blanche Wardell to establish the existence of an

---

[1]In reaching our determination, we need not consider the contents of the affidavit of Dr. Sanford Finkel, which as noted was presented by the petitioner for the first time with her motion to reconsider the trial court's summary judgment order and which contained averments relating to the decedent's lack of testamentary capacity and to undue influence. We first note that the trial court has discretion as to whether to consider new evidence presented for the first time after a motion for summary judgment. *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1 (1995); *Hall v. De Falco*, 178 Ill. App. 3d 408, 533 N.E.2d 448 (1988). A party may not submit new evidence in a motion to reconsider following a ruling on a motion for summary judgment without providing a reasonable explanation as to why the evidence was late. *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 545 N.E.2d 689 (1989); *Fister/ Warren v. Basins, Inc.*, 217 Ill. App. 3d 958, 578 N.E.2d 37 (1991). The refusal by the trial court to allow the filing of additional affidavits would not constitute an abuse of discretion where the petitioner has been given sufficient opportunity to prepare and present evidence in opposition to the defendant's motion for summary judgment. *Soderlund Brothers*, 278 Ill. App. 3d 606, 663 N.E.2d 1; *Wells v. Great Atlantic & Pacific Tea Co.*, 171 Ill. App. 3d 1012, 525 N.E.2d 1127 (1988).

However, here, we need not determine whether the trial court correctly exercised its discretion, since we conclude that even, without the Finkel affidavit, the facts from the other submissions on summary judgment support inferences of a lack of testamentary capacity as discussed above and of the existence of undue influence as discussed more fully below.

issue of fact as to the decedent's testamentary capacity because, according to respondents, Wardell did not provide a sufficient factual basis for her testimony that the decedent lacked testamentary capacity during the period in question. We disagree. A lay witness may give her opinion regarding the unsoundness of a testator's mind (*Powell v. Weld*, 410 Ill. 198, 101 N.E.2d 581 (1951)), so long as that witness had a sufficient opportunity in a conversation or some other transaction in which to form that opinion. *Butler v. O'Brien*, 8 Ill. 2d 203, 133 N.E.2d 274 (1956) (lay witness may testify to decedent's lack of testamentary capacity if testimony demonstrates sufficient opportunity to observe the condition of the decedent); *Eslick v. Montgomery*, 3 Ill. App. 3d 447, 278 N.E.2d 412 (1972) (nonexpert witness may testify as to decedent's competency if testimony reveals that he had sufficient opportunity to observe decedent).

Here, there is no question that Wardell had sufficient opportunity to make these observations as to the decedent's lack of testamentary capacity to execute his May 1990 will. Wardell specifically enumerated the bases for that opinion wherein she testified that she visited the decedent at his home in Chicago on various occasions prior to 1987 and that, subsequently, she repeatedly spoke with him by telephone and corresponded with him by letter. These communications are sufficient to render the lay opinion of Wardell admissible, and once admissible, its weight is not properly resolved on summary judgment. See *Butler*, 8 Ill. 2d 203, 133 N.E.2d 274 (lay testimony regarding testamentary capacity admissible where witness testified to numerous conversations with decedent and to having known and communicated with decedent over period of many years); *Lewis v. Deamude*, 376 Ill. 219, 33 N.E.2d 440 (1941) (lay testimony regarding testamentary capacity admissible where witness testified that certain conversations formed basis of opinion). See also *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278 (trial court may not weigh evidence on summary judgment).

Respondents also urge that Wardell contradicted herself in her deposition testimony and that, therefore, her testimony cannot be used to establish the existence of an issue of fact as to the decedent's testamentary capacity. In support, respondents contrast Wardell's statements that the decedent lacked testamentary capacity "solely [because the petitioner] was totally omitted from the will," with her detailed testimony regarding his lack of testamentary capacity. Respondents argue that these statements contradict each other and that, therefore, Wardell's detailed reasons supporting her belief that the decedent lacked testamentary capacity cannot be used to generate an issue of fact on that issue. We disagree.

While the foregoing quoted excerpt of testimony, when viewed in isolation, appears to exclude other supportive facts, Wardell's deposition as a whole provides numerous additional facts and observations upon which her opinion can be predicated. When viewed in the context of her entire deposition, it is clear that Wardell never abandoned her carefully supported belief that Roeseler lacked testamentary capacity. See *In re Estate of Sewart*, 236 Ill. App. 3d 1, 602 N.E.2d 1277 (1991) (court need not disregard statements in deposition testimony favoring nonmovant despite isolated contradictory statement if overall context of testimony shows no abandonment of position favoring nonmovant); *In re Estate of Mallas*, 100 Ill. App. 2d 88, 241 N.E.2d 482 (1968).

Respondents urge that the decisions of *Tidholm v. Tidholm*, 391 Ill. 19, 62 N.E.2d 473 (1945), and *Anthony v. Anthony*, 20 Ill. 2d 584, 170 N.E.2d 603 (1960), justify the entry of summary judgment here on the issue of testamentary capacity. However, those cases are fully distinguishable. Unlike here, where the trial court on summary judgment was precluded from weighing evidence, *Anthony* involved a trial at the conclusion of which the trial court was not precluded from weighing the evidence. Furthermore, although *Tidholm* involved the granting of a motion for a directed verdict, it is nevertheless factually distinguishable even if the directed verdict standard applied there were also applied to rulings on summary judgment motions. See generally *Fooden v. Board of Governors*, 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500 (1971) (permitting the *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967), standard to be applied in the granting of a summary judgment motion); *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 559 N.E.2d 961 (1990) (and citations therein). In *Tidholm*, the court held that there was uncontradicted evidence that the decedent transacted his own business during the period in question without any assistance, and no witness had testified that the decedent's mental problems related in any way to his ability to make a will. In contrast, here, Blanche Wardell testified in her deposition that, based upon her visits, telephone conversations and written correspondence with the decedent, she believed that he was totally incapable of making a will due to his markedly weakened mental abilities, which she described at one point as senility and incompetence. This was further corroborated by the medical records of Oak Park Hospital regarding the state of decedent's health and by Wardell's testimony regarding the state of squalor of decedent's house.

Petitioner next contends that the trial court erred in granting respondents' motion for summary judgment on the issue of undue

influence. We agree. In order to invalidate a will on the basis of undue influence, the petitioner must establish that the intent of the testator was overpowered and that he was induced to do or refrain from an act without free will, causing him to devise his property according to the plan of another person. *In re Estate of Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736 (1993); *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 448 N.E.2d 872 (1983); *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278. The influence must have been operative and must have been felt at the time the will was executed, even though it could have been exerted at any time. *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278. Furthermore, the more enfeebled the mind of the testator, the less evidence is required to establish the existence of undue influence. *Mitchell v. Van Scoyk*, 1 Ill. 2d 160, 115 N.E.2d 226 (1953); *Swenson v. Wintercorn*, 92 Ill. App. 2d 88, 234 N.E.2d 91 (1968).

■ To raise a presumption of undue influence, the party contesting the will must establish the existence of the following four elements: (1) that a fiduciary relationship existed between the testator and a person who substantially benefits under the will; (2) that the primary beneficiaries were in a position to dominate and control the dependant testator; (3) that the testator reposed trust and confidence in such beneficiaries; and (4) that such beneficiaries were instrumental in or participated in the procurement or preparation of the will. *Tidholm*, 391 Ill. 19, 62 N.E.2d 473; *Zachary v. Mills*, 277 Ill. App. 3d 601, 660 N.E.2d 1301 (1996); *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278. A fiduciary relationship may exist as a matter of law, such as in an attorney-client relationship, and may also arise from a relationship that is moral, social, domestic or personal in its origin. *Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736; *In re Estate of Maher*, 237 Ill. App. 3d 1013, 606 N.E.2d 46 (1992). Moreover, where a party having a claim to the testator's bounty is excluded following the active participation of a beneficiary in procuring a will, there is a presumption of undue influence irrespective of the existence of a fiduciary relationship. *Mitchell*, 1 Ill. 2d 160, 115 N.E.2d 226; *Maher*, 237 Ill. App. 3d 1013, 606 N.E.2d 46. As stated by our supreme court in *Hoover*:

> "What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case. [Citation.] The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason. [Citation.] Proof of undue influence may be wholly inferential and

circumstantial. [Citation.] The inference may be that of a beneficiary or that of a third person which will be imputed to the beneficiary. [Citations.] False or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence. [Citations.]" *Hoover*, 155 Ill. 2d at 411-12, 615 N.E.2d at 740.

■ In the instant case, there are genuine issues of material fact that should be resolved by the trier of fact as to whether respondents unduly influenced William Roeseler in the execution of his May 1990 will. The record supports a reasonable inference that respondents were in a fiduciary relationship with the decedent and were therefore in a position to dominate and control him, and that the decedent reposed trust and confidence in respondents. *Zachary*, 277 Ill. App. 3d 601, 660 N.E.2d 1301; *Ciesiolkiewicz*, 243 Ill. App. 3d 506, 611 N.E.2d 1278. In that regard, the record reflects that the decedent, due to his declining physical and mental health, relied upon Barbara Kubitz for his basic needs such as going grocery shopping, to the bank, and to pick up medical prescriptions. Additionally, the record supports an inference that Bernice Chadwick and Maxine Christopher were neighbors of and friends with the decedent and may have also assisted him as did Kubitz. See *Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736 (a fiduciary relationship may exist as a matter of law, such as in an attorney-client relationship, and may also arise from a relationship which is moral, social, domestic or personal in its origin). Moreover, in addition to these facts supporting an inference of a fiduciary relationship between decedent and respondents, it is undisputed that respondents Walter and Scott Christopher served the decedent as his attorney, that Scott served as the decedent's tax preparer, and that Barbara Kubitz had a power of attorney over the legal and financial affairs of the decedent, relationships that are by their very nature fiduciary. See *Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736; *Maher*, 237 Ill. App. 3d 1013, 606 N.E.2d 46.

Respondents would urge that because Scott Christopher did not prepare the May 1990 will, petitioner cannot now contend that respondents either prepared or participated in the procurement of that will. They urge that the fact that Scott would benefit from that will is irrelevant and the connection between respondents and the will in question is too tenuous to support a claim of undue influence. We disagree. As noted by our supreme court in *Hoover*:

> "Defendants argue *** that summary judgment was proper because plaintiffs failed to provide any evidence that Nancy's

influence *** was directly connected with the execution of the codicils which disinherited Robert, or that any influence on her part was directed towards procuring a will in her favor.

We find that defendants' argument is misguided. In this case, plaintiffs' complaint alleges a subtle, invidious kind of undue influence. *** [T]he testator may act as if directed and guided by his own agency but that agency may have been overpowered by 'secret influences.' [Citation.] In a 'secret influences' case, plaintiffs may introduce circumstantial evidence to demonstrate that the influence was connected with and operative at the time of execution of the will and that the influence was directed towards procuring the will in favor of the beneficiary." *Hoover*, 155 Ill. 2d at 413-14, 615 N.E.2d at 741.

As in *Hoover*, here, the fact that Scott Christopher did not personally prepare the May 1990 will does not preclude the inference from the totality of the evidence presented that respondents participated in the procurement and preparation of that will and that they unduly influenced the decedent in the creation of that will. In that regard, it is undisputed that despite his acknowledgement that he felt "uncomfortable" preparing a will in which his mother would be named as a beneficiary, Scott prepared the decedent's 1989 will, naming his own mother and her neighbors as the sole beneficiaries therein and excluding the sole beneficiaries of decedent's prior wills, the petitioner and her daughter, from any inheritance.

It is further undisputed that, in 1990, Scott Christopher, with the consent of his client, engaged Kurt Heerwagen to revise the 1989 will and that, under that revision, Scott stood to inherit directly from the decedent in the event that his mother Maxine predeceased the decedent. Thereafter, Scott sent Heerwagen a copy of the 1989 will, along with a letter outlining the contents of the decedent's new will. Furthermore, Heerwagen only briefly spoke with the decedent before preparing that will and, as noted, never knew that the decedent had been married or had a stepdaughter at that time. Ultimately, the 1990 will drafted by Heerwagen was identical to the 1989 will drafted by Scott, except that the newer will explicitly named Scott's mother's descendants as contingent beneficiaries in the event that she predeceased the decedent. The record is also clear that Scott had an established professional and social relationship with members of Heerwagen's firm. The foregoing facts can support a reasonable inference of undue influence, especially insofar as they raise an inference that Scott Christopher procured and in effect prepared the decedent's May 1990 will. See *Tidholm*, 391 Ill. 19, 62 N.E.2d 473 (where beneficiary under will gave notes to attorney preparing will, presumption

of undue influence arose to preclude directed verdict); *Zachary*, 277 Ill. App. 3d 601, 660 N.E.2d 1301 (question of fact as to undue influence issue existed where son of attorney preparing will was named as a beneficiary). See also *Swenson*, 92 Ill. App. 2d 88, 234 N.E.2d 91 (undue influence may be result of activities of third persons as well as of activities of direct beneficiaries). We also note, without giving this point undue emphasis, that the foregoing inference of undue influence is further bolstered by the fact that Heerwagen advised Scott Christopher to destroy the aforementioned letter outlining the 1990 will to preclude its use in a potential will contest and from the fact that Scott subsequently threw out that letter.

■ Lastly, petitioner contends that the trial court erred in dismissing her amended complaint, which alleged respondents' tortious interference with her economic expectancy to inherit from the decedent. We agree. To recover for tortious interference with an economic expectancy, the petitioner must establish the following: (1) the existence of an expectancy; (2) respondents' intentional interference therewith; (3) tortious conduct such as undue influence, fraud, or duress; (4) a reasonable certainty that the expectancy would have been realized but for the interference; and (5) damages. *In re Estate of Knowlson*, 204 Ill. App. 3d 454, 562 N.E.2d 277 (1990); *Nemeth v. Banhalmi*, 99 Ill. App. 3d 493, 425 N.E.2d 1187 (1981). If a will contest is available and would provide an adequate remedy to the petitioner, no tort action will lie. *In re Estate of Hoover*, 160 Ill. App. 3d 964, 513 N.E.2d 991 (1987). However, if no adequate remedy is available through probate proceedings, a tort action is permissible. *Knowlson*, 204 Ill. App. 3d 454, 562 N.E.2d 277; *In re Estate of Jeziorski*, 162 Ill. App. 3d 1057, 516 N.E.2d 422 (1987). In determining the adequacy of relief, an award for punitive damages is not considered a valid expectation. *Knowlson*, 204 Ill. App. 3d 454, 562 N.E.2d 277; *Hoover*, 160 Ill. App. 3d 964, 513 N.E.2d 991.

■ Here, the availability of probate relief is only speculative pending the consideration of the decedent's prior wills by the probate court, and, therefore, the dismissal of that action was in error. In that regard, if on remand the petitioner succeeds in her will contest and the decedent's 1984 will naming her as the primary beneficiary is then admitted to probate, the dismissal of the tort claim would be appropriate because the adequacy of the probate relief would be undisputed. See *Knowlson*, 204 Ill. App. 3d 454, 562 N.E.2d 277; *Hoover*, 160 Ill. App. 3d 964, 513 N.E.2d 991. However, if the 1984 will is not admitted, the petitioner's relief in probate would be inadequate, such that she should be able to proceed against respondents with her tort action. *Knowlson*, 204 Ill. App. 3d 454, 562 N.E.2d 277.

Pending these determinations, the dismissal of the tort complaint here was premature, especially to the extent that it contains the same underlying allegations of tortious conduct as those described in the will contest petition, which has now been revived.

Respondents would urge that the decisions of *Robinson v. First State Bank*, 97 Ill. 2d 174, 454 N.E.2d 288 (1983), and *Hoover*, 160 Ill. App. 3d 964, 513 N.E.2d 991, support the dismissal of petitioner's tort claim. However, those cases are fully distinguishable. In *Robinson*, the court denied the petitioner's tort action because it was not filed within the six-month statute of limitations period governing the filing of will contests after the admission of the will to probate. There is no such infirmity alleged here. See *Jeziorski*, 162 Ill. App. 3d 1057, 516 N.E.2d 422 (distinguishing *Robinson* on same grounds). Furthermore, in *Hoover*, the availability of relief to the petitioner from an earlier will and codicils was not speculative because those documents were already admitted to probate. As noted, unlike *Hoover*, here, adequate relief is not certain absent a tort action pending the admission of the decedent's prior wills to probate.

For the foregoing reasons, we conclude that there are material issues of fact that would preclude the entry of summary judgment on petitioner's will contest and the dismissal of her tort complaint for intentional interference with economic expectancy. Accordingly, the judgment of the circuit court of Cook County is reversed and the cause remanded for further proceedings.

Reversed and remanded.

COUSINS, P.J., and HOURIHANE, J., concur.